# Exhibit 5

ORIGINAL

FILED

01 NOV 27 PM 1:59

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

BY:_____ DEPUTY

1  MARTIN J. BRILL (State Bar No. 53220)
2  CRAIG M. RANKIN (State Bar No. 169844)
   DAVID B. GOLUBCHIK (State Bar No. 185520)
3  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   1801 Avenue of the Stars, Suite 1120
4  Los Angeles, California 90067
   Telephone:  (310) 229-1234
5  Facsimile:  (310) 229-1244

6  Attorneys for Chapter 11
7  Debtors and Debtors in Possession

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11              (SAN FERNANDO VALLEY DIVISION)

12  In re                          ) CASE NO. SV-01-11329-KL
                                   )
13  STAN LEE MEDIA, INC., a         ) Chapter 11
    Delaware corporation, and      )
14  STAN LEE MEDIA, INC., a         ) (Jointly Administered with Case
    Colorado corporation,          ) No. SV-01-11331-KL)
15                                 )
            Debtors and Debtors    )
16          in Possession          ) NOTICE OF MOTION AND MOTION FOR
                                   ) ORDER TO APPROVE SALE OF ASSETS
17  _____    ) FREE AND CLEAR OF LIENS;
                                   ) MEMORANDUM OF POINTS AND
18   x   Affects Both Debtors      ) AUTHORITIES; DECLARATION OF
    ___                            ) KENNETH S. WILLIAMS IN SUPPORT
19  ___  Affects Stan Lee          ) THEREOF
20  Media, Inc., a                 )
    Delaware corporation,          ) Date:  January 8, 2002
21  Only                           ) Time:  10:00 a.m.
                                   ) Place: Courtroom "301"
22  ___  Affects Stan Lee          )        21041 Burbank Blvd.
23  Media, Inc., a                 )        Woodland Hills, CA
    Colorado corporation,          )
24  Only                           )
    _____    )
25
26  ///
27  ///
28  ///
    ///

03364

## Table of Contents

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 6

I.  STATEMENT OF FACTS ....................................... 6

    A.  BACKGROUND. ............................................ 6
    B.  RELATIONSHIP WITH STAN LEE. ........................... 6
    C.  THE DEBTORS' CREATIVE ASSETS. ......................... 7
        1.  Produced Properties: ........................... 7
        2.  Co-Brands Produced: ............................ 7
        3.  Co-Brands In Development: ....................... 7
        4.  Developed Deals: ............................... 8
        5.  Other Projects (Undeveloped; Debtors acting as
            agent for assets only): ........................ 8
        6.  All trademarks, copyrights, original artwork and
            promotional material relating to the foregoing
            Creative Assets. ............................... 8
    D.  MARKETING OF THE CREATIVE ASSETS. ..................... 8
    E.  THE ASSET PURCHASE AGREEMENT .......................... 12
        1.  All cash, bank deposits and/or cash equivalents of
            the Debtors. ................................... 12
        2.  All of the Debtors' office equipment, computers,
            and servers. ................................... 12
        3.  Claims, lawsuits and causes of action of the
            Debtors. ....................................... 13
        4.  Tax refunds and tax attributes. ................ 13
        5.  Claims for relief under any of the avoiding powers
            provided for under Chapter 5 of the Bankruptcy
            Code. .......................................... 13
        6.  All books and records of the Debtors that do not
            relate to the Assets. .......................... 13
        7.  The Debtors' corporate charter or qualifications
            to conduct business as a corporation, arrangements
            with registered agents relating to foreign
            qualifications, taxpayer and other identification
            numbers, seals, minute books, transfer books, and
            other documents relating to the organization,
            maintenance, and existence of the Debtors as a
            corporation; or any of the rights of the Debtors
            under this Agreement. .......................... 13
        8.  The Debtors' interest in Conan Properties, Inc.
            and any rights or interests, including
             intellectual property rights, and interests in any
            of the properties and assets of CPI. ........... 13
        9.  Stan Lee Presents; ............................. 14
        10. Stan's Soapbox; and ............................ 14
        11. Stan Lee & Design. ............................. 14
    F.  THE SALE IS IN THE BEST INTEREST OF THE ESTATES. ...... 14
    G.  PROJECTED DISTRIBUTION BASED ON $4 MILLION TOTAL RETURN. ..... 15
    H.  PROJECTED DISTRIBUTION BASED ON $7 MILLION TOTAL RETURN. ..... 16

i

II.  DISCUSSION ............................................. 17

    A.  THE COURT SHOULD APPROVE THE DEBTORS' PROPOSED ASSET SALE TO
        PURCHASER PURSUANT TO SECTION 363(B) OF THE BANKRUPTCY CODE... 17
        1.   Sound Business Purpose ........................ 19
        2.   Accurate and Reasonable Notice ................ 21
        3.   Fair and Reasonable Price ..................... 22
        4.   Good Faith .................................... 24
    B.  SECTION 363(F) OF THE BANKRUPTCY CODE PERMITS THE DEBTORS' SALE
        OF THEIR ASSETS TO PURCHASER TO BE FREE AND CLEAR OF ALL
        INTERESTS ..................................................... 26
        1.   The Proposed Asset Sale is Permissible Pursuant to
            11 U.S.C. Section 363(f)(2). ................. 27
        2.   The Proposed Asset Sale is Permissible Pursuant to
            11 U.S.C. Section 363(f)(3). ................. 28

III. CONCLUSION ............................................. 29

ii

03366

1
2

# Table of Authorities

3

### CASES

4  Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.),
       63 B.R. 361, 368 (Bankr. N.D. Ohio 1986) ------------------------------------------------------- 23

5  In re Abbotts Dairies of Pennsylvania, Inc.,
       788 F.2d 143, 149 (3d Cir. 1986)------------------------------------------------------------- 23, 26, 27

6  In re Alpha Industries, Inc.,
       84 B.R. 703, 706 (Bankr. D. Mont. 1988) --------------------------------------------------------- 27

7  In re Apex Oil Co.,
8      92 B.R. 847, 869 (Bankr. E.D.Mo. 1988),
       citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983) ------------------------- 27

9  In re Atlanta Packaging Products, Inc.,
10     99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) --------------------------------------------------------- 24

   In re Continental Airlines, Inc.,
11     780 F.2d 1223 (5th Cir. 1986) --------------------------------------------------------------------- 20

12 In re George Walsh Chevrolet, Inc.,
       118 B.R. 99, 102 (Bankr. E.D. Mo. 1990) --------------------------------------------------------- 19

13 In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.,
14     77 B.R. 15, 21 (Bankr. E.D. Pa. 1987)------------------------------------------------------------ 19, 27

   In re Integrated Resources, Inc.,
15     135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992)------------- 24

16 In re Karpe,
       84 B.R. 926, 930 (Bankr. M.D.Pa. 1988) ------------------------------------------------------- 22, 23

17 In re Lady H. Coal Co., Inc.,
       193 B.R. 233 (Bankr. S.D.W.Va. 1996) ----------------------------------------------------------- 19

18 In re Lionel Corp.,
       722 F.2d 1063, 1071 (2d Cir. 1983) --------------------------------------------------------------- 18, 20

19 In re Oneida Lake Development, Inc.,
       114 B.R. 352 (Bankr. N.D.N.Y. 1990) ------------------------------------------------------------- 30

20 In re Rock Indus. Mach. Corp.,
21     572 F.2d 1195, 1198 (7th Cir. 1978) --------------------------------------------------------------- 27

22 In re Snyder,
       74 B.R. 872, 878 (Bankr. E.D. Pa. 1987) --------------------------------------------------------- 24

23 In re Terrace Gardens Park Partnership,
       96 B.R. 707 (Bankr. W.D.Tex. 1989) --------------------------------------------------------------- 31

24 In re The Landing,
       156 B.R. 246, 249 (Bankr. E.D. Mo. 1993) ------------------------------------------------------- 19

25 In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.,
26     32 B.R. 708 (N.D. Tex. 1983) ---------------------------------------------------------------------- 24

   In re WBQ Partnership,
27     189 B.R. 97, 102 (Bankr. E.D.Va. 1995) ---------------------------------------------------------- 19

28

03367

In re Wilde Horse Enterprises, Inc.,
 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991) -------------------------------19, 24, 26, 27

Walter v. Sunwest Bank (In re Walter),
 83 B.R. 14, 19 (9th Cir. B.A.P. 1988)---------------------------------------------20, 21

Willemain v. Kivitz,
 764 F.2d 1019 (4th Cir. 1985) -----------------------------------------------------23

STATUTES

11 U.S.C. § 363(b)(1) ---------------------------------------------------------------- 18

11 U.S.C. §363(f) ----------------------------------------------------------------------- 29

OTHER AUTHORITIES

3 Collier on Bankruptcy § 363.06[4], at pp. 363-46; (15th ed. Rev. 2001)-----------------------------30

iv

03368

**PLEASE TAKE NOTICE** that a hearing will be held on January 8, 2002, at 10:00 a.m., before the Honorable Kathleen T. Lax, United States Bankruptcy Judge for the Central District of California, in her Courtroom "301", located at 21041 Burbank Boulevard, Woodland Hills, California, to consider the motion (the "Motion") filed by Stan Lee Media, Inc., a Delaware corporation, and Stan Lee Media, Inc., a Colorado corporation, debtors and debtors in possession in the above-captioned Chapter 11 cases (the "Debtors"), For Order To Approve Sale Of Assets Free and Clear of Liens.

Pursuant to 11 U.S.C. § 105(a) and 11 U.S.C. ¶ 363(b), (f) and (m), the Debtors seek to sell certain of the Debtors' assets, as defined in the Asset Purchase Agreement (the "Agreement"), a true and correct copy of which is annexed to the accompanying declaration of Kenneth S. Williams as Exhibit "A", to SLC, LLC ("Purchaser"), free and clear of all liens, claims, encumbrances and interests, and exclusive of any and all debts, obligations, commitments, or responsibilities associated therewith, with any such liens, claims, encumbrances or interests to attach to the proceeds from the sale with the same priority, extent and validity which existed prior to the sale.

In summary, the Debtors own certain creative projects and developments (the "Creative Assets").  The Creative Assets were created, developed and primarily produced under the direction of pop-culture icon Stan Lee, co-creator of such classic characters

2

as *Spider-Man*™, the *Incredible Hulk*™ and the *X-Men*™. Pre-petition, Stan Lee was employed pursuant to an employment agreement with the Debtors, which Stan Lee contends was breached by the Debtors pre-petition. The Debtors dispute this contention.

Notwithstanding the foregoing, in order to exploit the Creative Assets and generate funds for the estates, it is crucial that Stan Lee be a part of such exploitation. The Debtors believe that the Creative Assets have minimal or no value without Stan Lee's involvement. However, any litigation regarding the validity of Stan Lee's employment agreement is likely to be time consuming, expensive and may result in "bad blood" which will jeopardize future exploitation of the Creative Assets.

Pursuant to the Agreement, the parties agreed that the Debtors will sell the Creative Assets to the Purchaser, an entity creatively controlled by Stan Lee. The Purchaser will continue to develop, exploit and monetize the Creative Assets. In consideration for their sale of assets to the Purchaser, the Debtors shall receive a percentage of the gross profit realized by the Purchaser from the exploitation of the developed Creative Assets, which is the best offer received by the Debtors.

The Agreement is the product of extended arms-length negotiations by and among the Debtors, Purchaser and the Official Committee of Unsecured Creditors. The Debtors believe that the

3

03370

Agreement is in the best interest of the estates in that the Agreement will result in creating value out of the Creative Assets, which value, the Debtors believe, can only be created with the direct involvement of Stan Lee.

The Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, and the Declaration of Kenneth S. Williams annexed hereto, 11 U.S.C. §§ 105, 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion must, not later than fourteen (14) days before the date of the hearing, be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors whose name and address are set forth at the top, left-hand corner of the first page of this Notice of Motion and Motion.

**PLEASE TAKE FURTHER NOTICE** that the Court may deem the failure of any party to object to the Motion to constitute consent to the relief sought by the Debtors.

///
///
///
///
///

4

03371

**WHEREFORE**, the Debtors respectfully request that the Court (1) grant the Motion; (2) approve the sale upon the terms and conditions set forth in the Agreement annexed hereto; and (3) grant such further and additional relief as the Court deems just and proper.

Dated: November 27, 2001          STAN LEE MEDIA, INC.,
                                  a Delaware corporation
                                          and
                                  STAN LEE MEDIA, INC.,
                                  a Colorado corporation

                                  By: _____
                                  MARTIN J. BRILL
                                  CRAIG M. RANKIN
                                  DAVID B. GOLUBCHIK
                                  LEVENE, NEALE, BENDER, RANKIN
                                  & BRILL L.L.P.
                                  Attorneys   for   Chapter   11
                                  Debtors   and   Debtors   in
                                  Possession

5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. STATEMENT OF FACTS

**A.   Background.**

Stan Lee Media, Inc., a Delaware corporation ("Stan Lee Delaware"), and Stan Lee Media, Inc. ("Stan Lee Colorado"), a Colorado corporation, Chapter 11 debtors and debtors in possession (collectively, the "Debtors") commenced these bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on February 16, 2001 (the "Petition Date"). The Debtors continue to operate their business and manage their financial affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

Stan Lee Delaware is a wholly-owned subsidiary of Stan Lee Colorado. Stan Lee Colorado is a public corporation that, prior to the Petition Date, traded on NASDAQ under the symbol "SLEE".

The Debtors operated as a digital entertainment studio that, prior to the Petition Date, developed and distributed branded entertainment properties under the direction of pop-culture icon Stan Lee, co-creator of such classic characters as *Spider-Man*™, the *Incredible Hulk*™ and the *X-Men*™.

**B.   Relationship With Stan Lee.**

Prior to the Petition Date, Stan Lee was employed by the Debtors pursuant to an employment agreement (the "Stan Lee Employment Agreement"). Prior to the Petition Date, Stan Lee contended that the Debtors were in breach under the Stan Lee

6

Employment Agreement and Stan Lee declared the Stan Lee Employment Agreement to be terminated as of January 29, 2001, both of which contentions the Debtors' dispute.

Notwithstanding the foregoing, the Debtors believe that any litigation regarding the validity of Stan Lee's employment agreement is likely to be time consuming, expensive and may result in "bad blood" which will jeopardize future exploitation of the Debtors' Assets, as described below.

C.   **The Debtors' Creative Assets.**

Although the Debtors do own certain minimal office equipment, by far, the Debtors' most valuable assets include their branded entertainment properties (the "Creative Assets") which were created and developed under Stan Lee. The Creative Assets[1], as described in the annexed Asset Purchase Agreement, and in greater detail in exhibits thereto, include the following:

   1.   Produced Properties:
        a) Stanlee.NET web site and portal;
        b) The Accuser;
        c) The Drifter; and
        d) Stan's Evil Clone.

   2.   Co-Brands Produced:
        a) The Backstreet Project.

   3.   Co-Brands In Development:
        a) Gene Roddenberry's Starship;
        b) Mary J. Blige;
        c) X-Treme Heroes;
        d) Police Force 2220;
        e) Chrysallis;
        f) The Stone Giant;
        g) Battle School Tranquility;

---

[1] The Creative Assets which are the subject of this Motion exclude the 7th Portal Project, which is the subject of a dispute with Salim/Stagg.

7

03374

h) Story Bible; and
i) Stan Junior.

4. <u>Developed Deals</u>:

a) 50% interest in Lee Schultz Partnership.

5. <u>Other Projects (Undeveloped; Debtors acting as agent for assets only)</u>:

a) DC Comics;
b) Toon Boom;
c) Cyberworld;
d) Mobius;
e) Hollywood Christmas Parade;
f) Scuzzle; and
g) Scuzzle Design.

6. <u>All trademarks, copyrights, original artwork and promotional material relating to the foregoing Creative Assets</u>.

**D.   Marketing of the Creative Assets.**

Due to lack of financing, pre-petition the Debtors laid off most of their employees and generally ceased ongoing operations. The Debtors filed the instant cases in order to find a strategic partner or a purchaser for their assets in order to maximize the recovery for the estates.

At the outset of these cases, the Debtors created a sales memorandum (the "Marketing Package"), which included a detailed listing of the Debtors' assets, primarily consisting of the Creative Assets. The Marketing Package contained a detailed explanation of each of the assets, together with a listing of deals entered into by the Debtors relating to such assets. The comprehensive Marketing Package, the relevant excerpts of which are attached to the annexed Agreement, allowed prospective

8

03375

purchasers and interested parties to analyze the Debtors' assets and make an informed decision whether to purchase or infuse capital with respect to such assets.

Upon finalizing the Marketing Package, the Debtors sent the Marketing Package to over 40 financial and entertainment entities which may have had an interest in the Debtors' business. The Debtors' marketing efforts, which included a request for interim post-petition financing, resulted in approximately 12 meetings and conferences with interested parties, including Interfase Capital, L.P. ("Interfase").

As set forth above, in order for the Debtors to be able to market the Debtors' assets and negotiate with third parties as a "going concern" entity, the Debtors required financing. The Debtors were able to negotiate the terms of a post-petition debtor-in-possession financing facility pursuant to which the Debtors would commence limited operations pending a sale or restructuring of the Debtors' business. On May 3, 2001, this Court entered that certain "Final Order Approving Emergency Motion Pursuant To Local Bankruptcy Rule 9075-1(1) For Authority To Obtain Post-Petition Financing" (the "Order"), pursuant to which the Court approved the Debtor-in-Possession financing agreement (the "Financing Agreement") entered into by the Debtors and Interfase. Pursuant to the Financing Agreement, Interfase committed to provide at least $250,000 in post-petition financing for the Debtors' operations, and potentially, $250,000 more in

9

03376

the future. In turn, Interfase was granted a security interest in substantially all of the Debtors' pre-petition and post-petition assets. Additionally, based on Interfase's representations that it was interested in either acquiring or merging with the Debtors, Interfase was granted a 60-day exclusive right to negotiate with the Debtors.

Unfortunately, the discussions between the Debtors and Interfase did not proceed as hoped by the Debtors. No agreement was reached between the Debtors and Interfase regarding a recapitalization of the Debtors or a sale of the Debtors' assets to Interfase. Moreover, Interfase refused to provide the additional $250,000 in financing to the Debtors, which essentially shut down the Debtors' operations again.

Upon being released of the exclusivity requirement to negotiate with Interfase, the Debtors attempted to market their projects to other interested entities, which included companies in the United States and in Canada. However, as a result of Interfase's exclusivity period, other potential deals "fell apart" and could not be revived by the Debtors. Additionally, through discussions with such third parties, it was clear that (1) no party would recapitalize the Debtors through a plan of reorganization due primarily to the fact that the Debtors' public shares (SLEE) have been damaged by the bad press and federal indictments relating to the Debtors' former management and

shareholder lawsuits; and (2) any sale transaction must involve Stan Lee, personally, and his creative abilities.

As discussed above, Stan Lee contended that his employment agreement with the Debtors was breached and terminated pre-petition and, therefore, unassignable. While the Debtors disputed Mr. Lee's contentions, the fact is that any litigation would take a long time, be expensive, and result in "bad blood," which would be detrimental to any possibility of having Stan Lee exploit the Debtors' assets. Additionally, it is likely that Stan Lee's personal services employment agreement is not one which can be assumed and assigned over Mr. Lee's objection, as provided for in 11 U.S.C. § 365(c).

Based on the foregoing, the Debtors involved Stan Lee, through his independent counsel, in their negotiations. Stan Lee cooperated with the Debtors' efforts and assisted the Debtors in their marketing efforts to the best of his ability. Unfortunately, the Debtors were unable to reach any agreements with third parties which would be acceptable to everyone and which had a chance of benefiting the estates.

After it was clear that the Debtors would not be able to consummate a transaction with third parties and that the Debtors had no ability to monetize their productions, Stan Lee contacted the Debtors to advise them that Stan Lee would be interested in trying to exploit and monetize the Debtors' assets. In that regard, Stan Lee made an offer to the Debtors to acquire the

11

Creative Assets and exploit them, with the estates sharing in future revenues. Based on the Debtors' unsuccessful marketing efforts and the importance of Stan Lee's personal involvement in the productions, it was evident that the highest and best use for the estates' assets would be through the exploitation of such assets by Stan Lee. Accordingly, the Debtors engaged in negotiations with Stan Lee, who was represented by independent counsel, regarding the development and exploitation of the Creative Assets. The Creditors' Committee was also involved in such negotiations and assisted the Debtors in obtaining a result which is much more favorable for the estate than originally proposed by Stan Lee.

**E.   The Asset Purchase Agreement**

Based upon extensive negotiations among the Debtors, the Committee and Stan Lee, which spanned approximately two (2) months, the parties reached an agreement, the salient terms of which the Debtors understand are acceptable to the Committee. The agreement of the parties is memorialized in that certain Asset Purchase Agreement (the "Agreement"), a true and correct copy of which is attached to the annexed Declaration of Kenneth S. Williams as Exhibit "A". In summary, the Agreement provides as follows:

12

03379

1.   The Debtors shall transfer the Creative Assets, excluding the 7th Portal project, to SLC, LLC (the "Purchaser"), an entity controlled by Stan Lee.

2.   The Purchaser shall use its best efforts to exploit the Creative Assets.

3.   The sale shall specifically exclude the following:

    a.   All cash, bank deposits and/or cash equivalents of the Debtors.

    b.   All of the Debtors' office equipment, computers, and servers.

    c.   Claims, lawsuits and causes of action of the Debtors.

    d.   Tax refunds and tax attributes.

    e.   Claims for relief under any of the avoiding powers provided for under Chapter 5 of the Bankruptcy Code.

    f.   All books and records of the Debtors that do not relate to the Assets.

    g.   The Debtors' corporate charter or qualifications to conduct business as a corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, transfer books, and other documents relating to the organization, maintenance, and existence of the Debtors as a corporation; or any of the rights of the Debtors under this Agreement.

    h.   The Debtors' interest in Conan Properties, Inc. and any rights or interests, including intellectual property rights, and interests in any of the properties and assets of CPI.

4.   In consideration for the sale of the Creative Assets, the following revenue-sharing program shall be implemented by the parties:

    a.   Until such time as the allowed secured claim of Interfase is satisfied in full by the Debtors or their estates (the "First Target"), the Purchaser shall pay to the Debtors, or their estates, for

13

payment to Interfase, 60% of the gross income received by the Purchaser from the exploitation of the Primary Assets, which are set forth in Sections 1.1.1, 1.1.2, and 1.1.4 of the Agreement.

b. Upon successfully achieving the First Target and until such time as the Debtors or their estates recover $250,000 from the Purchaser's exploitation of the Primary Assets (the "Second Target"), the Purchaser shall pay to the Debtors, or their estates, 40% of the gross income received by the Purchaser from the exploitation of the Primary Assets.

c. Upon successfully achieving the Second Target and until such time as the Purchaser recovers its advance (as described in Paragraph 4(a) above), wherein Purchaser consented to increase the Debtors' share of the exploitation of the Primary Assets from 40% to 60% of gross income received by Purchaser until such time as Interfase's security interest is satisfied in full (the "Third Target"), the Purchaser shall pay to the Debtors, or their estates, 20% of the gross income received by the Purchaser from the exploitation of the Primary Assets.

d. Upon successfully achieving the Third Target and until such time as (a) all allowed claims (excluding any equity interests in the Debtors) are satisfied in full, net of other recoveries; and (b) the Debtors' estates receive the sum of one (1) million dollars from the exploitation of the Assets over and above the amount necessary to satisfy all allowed claims, the Purchaser shall pay to the Debtors, or their estates, 40% of the gross income received by the Purchaser from the exploitation of the Primary Assets.

e. In consideration for the purchase of the assets described in Sections 1.1.3 and 1.1.5 of the Agreement (the "Agency Assets"), the Purchaser shall pay to the Debtors, or their estates, 12% of the gross income received by the Purchaser from the exploitation of the Agency Assets.

5. In addition to the foregoing, Stan Lee demanded, and the estates consented, to transfer the following intellectual

14

property assets to Stan Lee, personally, without any obligation of Stan Lee to compensate the Debtors or their estates for such assets (the "Free Assets"):

        a.   Stan Lee Presents;

        b.   Stan's Soapbox; and

        c.   Stan Lee & Design.

**F.   The Sale is in the Best Interest of the Estates.**

As discussed in detail above, the Debtors believe that without the active involvement of Stan Lee, the Debtors will not be able to exploit the value of the Creative Assets. In fact, currently, without the involvement of Stan Lee, the Debtors believe that the Creative Assets have virtually no value.

On the other hand, the Agreement allows Stan Lee to exploit the Creative Assets, while allowing the Debtors' estates to share in the revenue stream from such exploitation. Attached hereto as Exhibit "B" are projections of the revenue stream relating to the exploitation of the Creative Assets (the "Projections"). The Projections are based on a 3-5 year character life and utilize a conservative royalty rate of 5%.

The success of characters similar to the Assets depends upon the characters achieving a television or movie contract, which is similar to an anchor tenant in a strip mall. Once a movie or television contract is achieved, the characters can also be monetized through merchandise, apparel, comic books and book contracts.

15

03382

Although Stan Lee's characters have generally had a high degree of success, the fact is that it is unknown which characters will succeed and which will not. The general industry standard is to develop a multitude of characters and "bet" on a few characters succeeding.

Based on the foregoing industry standards and assumptions, the Debtors estimate that the Assets can generate between $4-$7 million over the next five years.

G.  **Projected Distribution Based on $4 Million Total Return.**

Utilizing the lower-end of the projections ($4 million), and based on Interfase's claim of $250,000, the revenues would be shared as follows:

First $416,666.67 – Of the foregoing revenues, the Debtors' share would be $250,000, to pay Interfase, and the Purchaser's share would be $166,666.67.

Next $625,000 (total revenues to date of $1,041,666.67) – Of the next $625,000, the Debtors' share would be $250,000 and the Purchaser's share would be $375,000.

Next $416,666.67 (total revenues to date of $1,458,333.34) – Of the next $416,666.67, the Debtors' share would be $83,333.34 and the Purchaser's share would be $333,333.33.

Next $2,541,666.66 (total revenues to date of $4 million) – Of the next $2,541,666.66, the Debtors' share would be $1,016,666.66 and the Purchaser's share would be $1,525,000.

16

Therefore, in the event that the exploitation of the Assets results in gross income of $4 million, the Debtors' estates will generate, after payment of Interfase's secured claim, the sum of $1,683,333.00.

**H.    Projected Distribution Based on $7 Million Total Return.**

In the event that the Purchaser **"hits a jackpot"** with the exploitation of the Assets Utilizing the higher-end of the projections ($7 million), and based on Interfase's claim of $250,000, the revenues would be shared as follows:

First $416,666.67 – Of the foregoing revenues, the Debtors' share would be $250,000, to pay Interfase, and the Purchaser's share would be $166,666.67.

Next $625,000 (total revenues to date of $1,041,666.67) – Of the next $625,000, the Debtors' share would be $250,000 and the Purchaser's share would be $375,000.

Next $416,666.67 (total revenues to date of $1,458,333.34) – Of the next $416,666.67, the Debtors' share would be $83,333.34 and the Purchaser's share would be $333,333.33.

Next $5,541,666.66 (total revenues to date of $7 million) – Of the next $5,541,666.66, the Debtors' share would be $2,216,666 and the Purchaser's share would be $3,325,000.

Therefore, in the event that the exploitation of the Assets results in gross income of $7 million, the Debtors' estates will

17

generate, after payment of Interfase's secured claim, the sum of $2,799,999.34.

## II.     DISCUSSION

**A.    The Court Should Approve the Debtors' Proposed Asset Sale to Purchaser Pursuant to Section 363(b) of the Bankruptcy Code.**

Section 363(b)(1) of the Bankruptcy Code provides:

> "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

11 U.S.C. § 363(b)(1). As a general matter, "a judge determining a Section 363(b) application [should] find from the evidence presented before him at the hearing a good business reason to grant such an application." In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). The party moving under Section 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization. Id

Certain factors pertinent to this analysis have been articulated; specifically, the Court should consider whether:

> (1)  a sound business purpose justifies the sale;
>
> (2)  accurate and reasonable notice of the sale was provided;

18

(3)    the price to be paid is adequate, <u>i.e.</u>,

fair and reasonable; and

(4)    the sale is in good faith, <u>i.e.</u>, there

is an absence of any lucrative deals

with insiders.

<u>In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); <u>In re Wilde Horse Enterprises, Inc.</u>, 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); <u>In re The Landing</u>, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); <u>In re George Walsh Chevrolet, Inc.</u>, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990); <u>In re WBQ Partnership</u>, 189 B.R. 97, 102 (Bankr. E.D.Va. 1995); <u>In re Lady H. Coal Co., Inc.</u>, 193 B.R. 233 (Bankr. S.D.W.Va. 1996).

The Debtors' proposed sale to Purchaser meets the foregoing criteria, is appropriate and should be approved by the Court.

**1.    Sound Business Purpose**

There must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under Section 363(b). <u>In re Lionel Corp.</u>, <u>supra</u>, 722 F.2d at 1070. The Ninth Circuit Bankruptcy Appellate Panel in <u>Walter v. Sunwest Bank (In re Walter)</u>, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of

19

the estate under Section 363(b).   In _Walter_, the Bankruptcy
Appellate Panel, adopting the reasoning of the Fifth Circuit in
_In re Continental Airlines, Inc._, 780 F.2d 1223 (5th Cir. 1986)
and the Second Circuit in _In re Lionel Corp._, _supra_, articulated
the standard to be applied under Section 363(b) as follows:

> "Whether the proffered business justification
> is sufficient depends on the case.   As the
> Second Circuit held in _Lionel_, the bankruptcy
> judge should consider all salient factors
> pertaining    to    the    proceeding    and,
> accordingly,   act   to   further   the   diverse
> interests of the Debtor, creditors and equity
> holders, alike.  He might, for example, look
> to such relevant facts as the proportionate
> value of the asset to the estate as a whole,
> the amount of elapsed time since the filing,
> the likelihood that a plan of reorganization
> will be proposed and confirmed in the near
> future,    the    effect    of    the    proposed
> disposition    on    future    plans    of
> reorganization, the proceeds to be obtained
> from the disposition vis-a-vis any appraisals
> of the property, which of the alternatives of
> use, sale or lease the proposal envisions
> and, most importantly perhaps, whether the
> asset is increasing or decreasing in value.
> This list is not intended to be exclusive,
> but  merely  to  provide  guidance  to  the
> bankruptcy judge."

_In Re Walter_, _supra_, 83 B.R. at 19-20, _citing_ _In re Continental
Air Lines, Inc._, 780 F.2d 1223, 1226 (5th Cir. 1986).

The facts pertaining to the Debtors' proposed sale to
Purchasers amply substantiate the Debtors' business decision that
their contemplated asset sale to Purchaser in accordance with the
terms of the Agreement is in the best interests of the Debtors'
estates and their creditors and merits the approval of this
Court.

03387

From the date of the filing of the Debtors' bankruptcy cases, the Debtors marketed their assets to third parties in order to obtain a capital infusion into the Debtors' operations or effectuate a sale of the Debtors' assets. From the outset of the Debtors' marketing efforts, it was abundantly clear that without the active involvement of Stan Lee, the Debtors will not be able to exploit the value of the Creative Assets or generate a return. Based on conversations with such parties, it was also clear that such entities did not care as much about the Creative Assets as they cared about bringing Stan Lee on board. However, due to the alleged breach of Stan Lee's employment agreement and the fact that it is unlikely that a personal services contract can be assumed and assigned over Stan Lee's objection, the negotiation process was very difficult for the Debtors. Eventually, the Debtors were able to reach an agreement with Stan Lee with respect to the Creative Assets, which agreement the Debtors believe is acceptable to the Committee, pursuant to which the estates will share in a percentage of the gross income derived by the Purchaser from the exploitation of the Creative Assets.

Based on the foregoing, the Debtors were able to monetize the value of the Creative Assets for the benefit of the estates. The foregoing demonstrates that the Debtors' proposed sale to Purchaser in accordance with the terms of the Agreement is justified by sound business purposes, satisfying the first

21

requirement for a sale under Section 363(b) of the Bankruptcy Code.

**2.   Accurate and Reasonable Notice**

A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988). The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections. Id.

The Debtors have provided a notice of their proposed sale to all creditors and parties in interest. Additionally, the Debtors served a copy of this Motion, together with all attached exhibits, upon Interfase, the secured creditor herein, the Official Committee of Unsecured Creditors, the Office of the United States Trustee, and all parties who served the Debtors with a request for special notice. Additionally, if any party requests a copy of the Motion, the Debtors will forward a copy of the Motion promptly upon receipt of such a request.

The Debtors submit that their proposed notice is reasonable and appropriate under the circumstances.

**3.   Fair and Reasonable Price**

In order to be approved under Section 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable. Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986). Several courts have held that "fair value" is given for property

22

03389

in a bankruptcy sale when at least 75% of the appraised value of such property is paid.  See In re Karpe, supra, 84 B.R. at 933; In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir. 1985); In re Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp., 32 B.R. 708 (N.D. Tex. 1983).  However, the Debtors also realize that their "main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."  In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); see also In re Wilde Horse Enterprises, supra, 136 B.R. at 841 ["in any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold"].

The Debtors believe that the terms of the Agreement (i.e., sharing in the future revenue stream of the exploitation of the Creative Assets) constitutes a fair and reasonable purchase price for the assets under the current circumstances for the following reasons:

23

1.    The Debtors have been marketing the Creative Assets from the commencement of their cases.  Although negotiations with different parties took place, after months of marketing, only one real offer was presented to the Debtors.  The offer was presented by the Purchaser.  Even after the offer was presented by the Purchaser, the Debtors and the Committee spent months negotiating the terms of the sale, which terms have now been approved and finalized in the attached Agreement.

2.    From the outset of the Debtors' marketing efforts, it was clear that the only way to maximize the value of the Creative Assets was to have a package deal with Stan Lee.  Pursuant to the Agreement, Stan Lee will be the person that is primarily responsible for exploiting the assets.  As a result, the Debtors were able to overcome the primary obstacle to maximizing the value of the Creative Assets.

3.    Based on the revenue-sharing arrangement set forth in the Agreement, the interests of the Debtors are aligned with those of the Purchaser.  In other words, if the revenue stream is maximized, everyone benefits.

4.    Finally, as discussed above, the exploitation of the assets is likely to result in a net distribution to the Debtors estates, after payment of Interfase's secured claim, of approximately $1.68-$2.8 million.

Moreover, the terms of the Agreement were arrived at following arms-length negotiations between the parties, including

24

the active involvement of the Committee, and represents the best, and only, offer received by the Debtors.  For all of the reasons described above, consummating the proposed asset sale to Purchaser in accordance with the terms of the Agreement is clearly the best option available for the Debtors' estates and their creditors.

### 4.   Good Faith

When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  In re Abbotts Dairies, supra, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith.  Id. at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction.  In re Wilde Horse Enterprises, supra, 136 B.R. at 842.  With respect to the Debtor's conduct in conjunction with the Sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction."  See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., supra, 77 B.R. 15, 17. With respect to Purchaser's conduct, this Court should consider

03392

whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders." In re Abbotts Dairies, supra, 788 F.2d at 147, In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse Enterprises, Inc., supra, 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings." In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D.Mo. 1988), citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

The terms of the proposed sale of the Debtors' assets to Purchaser were negotiated in good faith in arm's-length process. Although the Purchaser is an "insider" of the Debtors due to Stan Lee's involvement, the Purchaser was represented by independent counsel at all stages of negotiations. Additionally, due to the existing relationship between the Debtors and Stan Lee, the Debtors sought and obtained the involvement of the Committee, as the entity representing and protecting the interests of the creditor base. The proposed sale confers no special or undisclosed benefit upon any insider of the Debtors, other than Stan Lee's income from the continued exploitation of the Creative Assets by Stan Lee through the Purchaser. There is no distribution of any kind whatsoever to any equity holder, officer or director of the Debtors which is made part of the proposed

26

sale to Purchaser.  No insider of the Debtors will receive any special treatment in connection with the proposed sale.  Finally, there is no fraud involving Purchaser or the Debtors and no collusion between Purchaser and any other Purchasers or the Debtors.

Based on these facts, the Debtors submit that the Court should find that the Purchaser is a good faith purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code.

**B.   Section 363(f) of the Bankruptcy Code Permits the Debtors' Sale of Their Assets to Purchaser to Be Free and Clear of All Interests.**

Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

> "The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; ...
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

27

(4) Such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. §363(f).   Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.   Thus, a debtor need only meet the provisions of one of the five subsections of Section 363(f) in order for a sale of property free and clear of interests to be permissible.

1.   **The Proposed Asset Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(2).**

The only secured creditor in these cases is Interfase which provided post-petition financing ($250,000) to the Debtors and which received a blanket security interest upon all of the Debtors' assets, including the assets subject to this Motion. The Agreement acknowledges the existence of the Interfase secured claim and provides for the payment of such secured claim before any distribution is made to the estates.   The Debtors believe that Interfase will consent to the proposed sale on the condition that its liens attach to the proceeds derived from such assets. The Debtors consent to providing for Interfase's liens to attach to the estates' proceeds in respect to the Agreement.

2.   **The Proposed Asset Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(3).**

Section 363(f)(3) allows a sale to take place free and clear of liens if the sale price "is greater than the aggregate value

28

03395

of all liens on such property." Interfase is the only creditor that holds a security interest in the Creative Assets. As Collier on Bankruptcy states, "[c]onstruction of the phrase 'the aggregate value of all liens has sharply divided the courts. One line of authority holds that the "aggregate value of all liens" means the actual economic value of the liens or the value of the lien as determined under Section 506(a). 3 Collier on Bankruptcy § 363.06[4], at pp. 363-46; (15th ed. Rev. 2001); See In re Oneida Lake Development, Inc., 114 B.R. 352 (Bankr. N.D.N.Y. 1990); In re Terrace Gardens Park Partnership, 96 B.R. 707 (Bankr. W.D.Tex. 1989).

As discussed above, currently, without the involvement of Stan Lee, the Debtors believe that the Creative Assets have virtually no value. Pursuant to Section 506(a), Interfase's security interest in the Creative Assets is equal to the value of such assets, which is virtually nothing at the present. Under the proposed sale, the value of such Creative Assets will surely exceed the current value, as set forth in the Projections attached hereto as Exhibit "B". In fact, the proposed sale is the only way to monetize the Creative Assets. As a result, the sale price does exceed the aggregate value of the liens secured by such property. Moreover, based on the Projections, the sale price exceeds the face amount of Interfase's lien. Interfase's liens will continue to attach to the estates' proceeds resulting from the Agreement.

29

### III.      CONCLUSION

For all of the foregoing reasons, the Debtors respectfully request that the Court (1) grant the Motion; (2) approve the sale upon the terms and conditions set forth in the Agreement; and (3) grant such further and additional relief as the Court deems just and proper.

Dated: November 27, 2001        STAN LEE MEDIA, INC.,
                                a Delaware corporation
                                        and
                                STAN LEE MEDIA, INC.,
                                a Colorado corporation


                                By: _____
                                    MARTIN J. BRILL
                                    CRAIG M. RANKIN
                                    DAVID B. GOLUBCHIK
                                    LEVENE, NEALE, BENDER, RANKIN
                                      & BRILL L.L.P.
                                    Attorneys for Chapter 11 Debtors
                                    and Debtors in Possession

30

03397

## DECLARATION OF KENNETH S. WILLIAMS

I, Kenneth S. Williams, do hereby declare as follows:

1. I am the Chief Executive Officer of Stan Lee Media, Inc., a Delaware corporation ("Stan Lee Delaware"), and Stan Lee Media, Inc., a Colorado corporation ("Stan Lee Colorado"), Chapter 11 debtors and debtors in possession (collectively, the "Debtors").

2. I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify competently with respect thereto.

**A.   Background.**

3. The Debtors commenced these bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on February 16, 2001 (the "Petition Date"). The Debtors continue to operate their business and manage their financial affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

4. Stan Lee Delaware is a wholly-owned subsidiary of Stan Lee Colorado. Stan Lee Colorado is a public corporation that, prior to the Petition Date, traded on NASDAQ under the symbol "SLEE".

5. The Debtors operated as a digital entertainment studio that, prior to the Petition Date, developed and distributed branded entertainment properties under the direction of pop-culture icon Stan Lee, co-creator of such classic characters as *Spider-Man*™, the *Incredible Hulk*™ and the *X-Men*™.

31

**B.    Relationship With Stan Lee.**

6. Prior to the Petition Date, Stan Lee was employed by the Debtors pursuant to an employment agreement (the "Stan Lee Employment Agreement").   Prior to the Petition Date, Stan Lee contended that the Debtors were in breach under the Stan Lee Employment Agreement and Stan Lee declared the Stan Lee Employment Agreement to be terminated as of January 29, 2001, both of which contentions the Debtors' dispute.

7. Notwithstanding the foregoing, I believe that any litigation regarding the validity of Stan Lee's employment agreement is likely to be time consuming, expensive and may result in "bad blood" which will jeopardize future exploitation of the Debtors' assets.

**C.    The Debtors' Creative Assets.**

8. Although the Debtors do own certain minimal office equipment, by far, the Debtors' most valuable assets include their branded entertainment properties (the "Creative Assets") which were created and developed under Stan Lee.   The Creative Assets[2] are described in that certain Asset Purchase Agreement, a true and correct copy of which is attached hereto as Exhibit "A".

**D.    Marketing of the Creative Assets.**

9. Due to lack of financing, pre-petition the Debtors' management laid off most of the Debtors' employees and generally ceased ongoing operations.   The Debtors filed the instant cases

---

[2] The Creative Assets which are the subject of this Motion exclude the 7th Portal Project, which is the subject of a dispute with Salim/Stagg.

32

in order to find a strategic partner or a purchaser for their assets in order to maximize the recovery for the estates.

10. At the outset of these cases, the Debtors' management and creative talent created a sales memorandum (the "Marketing Package"), which included a detailed listing of the Debtors' assets, primarily consisting of the Creative Assets. The Marketing Package contained a detailed explanation of each of the assets, together with a listing of deals entered into by the Debtors relating to such assets. The comprehensive Marketing Package, the relevant excerpts of which are attached to the annexed Agreement, allowed prospective purchasers and interested parties to analyze the Debtors' assets and make an informed decision whether to purchase or infuse capital with respect to such assets.

11. Upon finalizing the Marketing Package, the Debtors sent the Marketing Package to over 40 financial and entertainment entities which may have had an interest in the Debtors' business. The Debtors' marketing efforts, which included a request for interim post-petition financing, resulted in approximately 12 meetings and conferences with interested parties, including Interfase Capital, L.P. ("Interfase").

12. As set forth above, in order for the Debtors to be able to market the Debtors' assets and negotiate with third parties as a "going concern" entity, the Debtors required financing. The Debtors were able to negotiate the terms of a post-petition

33