# Exhibit  6

1

2   MARTIN J. BRILL (State Bar No. 53220)
    CRAIG M. RANKIN (State Bar No. 169844)
3   DAVID B. GOLUBCHIK (State Bar No. 185520)
    LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
4   1801 Avenue of the Stars, Suite 1120
    Los Angeles, California 90067
5   Telephone:  (310) 229-1234
    Facsimile:  (310) 229-1244
6

7   Attorneys for Chapter 11
    Debtors and Debtors in Possession





8

9

10

11

12

13  In re                         ) CASE NO. SV-01-11329-KL
                                   )
14  STAN LEE MEDIA, INC., a        ) Chapter 11
    Delaware corporation, and      )
15  STAN LEE MEDIA, INC., a        ) (Jointly Administered with Case
    Colorado corporation,          ) No. SV-01-11331-KL)
                                   )
16                                 )
        Debtors and Debtors        )
17      in Possession              ) **ORDER GRANTING MOTION FOR ORDER**
                                   ) **TO APPROVE SALE OF ASSETS FREE**
18  _____    ) **AND CLEAR OF LIENS**
                                   )
19  _x_  Affects Both Debtors      ) Date:   February 12, 2002
                                   ) Time:   10:00 a.m.
20  ___  Affects    Stan    Lee    ) Place:  Courtroom "301"
        Media,      Inc.,     a    )         21041 Burbank Blvd.
21      Delaware corporation,      )         Woodland Hills, CA
        Only                       )
22                                 )
                                   )
23  ___  Affects    Stan    Lee    )
        Media,      Inc.,     a    )
24      Colorado corporation,      )
        Only                       )
25  _____    )

26       A  hearing  was  held  on  February  12,  2002,  at  10:00  a.m.

27  before  the  Honorable  Kathleen  T.  Lax,  United  States  Bankruptcy

28  Judge  for  the  Central  District  of  California,  in  her  Courtroom

    "301",  located  at  21041  Burbank  Boulevard,  Woodland  Hills,

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**(SAN FERNANDO VALLEY DIVISION)**

1

2 California, to consider the motion (the "Motion") filed by Stan

3 Lee Media, Inc., a Delaware corporation, and Stan Lee Media,

4 Inc., a Colorado corporation, debtors and debtors in possession

5 in the above-captioned Chapter 11 cases (the "Debtors"), For

6 Order To Approve Sale Of Assets Free and Clear of Liens to SLC,

7 LLC ("Buyer"). Appearances were as set forth on the Court's

8 record.

9 This Court, having considered the Motion, the Declaration in

10 support of the Motion, the supplemental pleadings filed in

11 support of the Motion, certain oppositions to the Motion, and the

12 record in these cases, proper notice of the Motion and the

13 hearing on the Motion having been given, and good cause appearing

14 therefore,

15

16 THIS COURT HEREBY FINDS THAT:

17 A. The Debtors' secured creditor, Wild Brain, Inc. ("Wild

18 Brain"), has consented to the Debtors' sale to Buyer in

19 accordance with the terms and conditions of the Asset Purchase

20 Agreement dated November 19, 2001, between the Debtors and Buyer,

21 a true and correct copy of which is attached hereto as Exhibit

22 "A", as modified by that certain Amendment to Asset Purchase

23 Agreement dated January 20, 2002, between the Debtors and Buyer,

24 a true and correct copy of which is attached hereto as Exhibit

25 "B", and as further modified by a second Amendment to Asset

26 Purchase Agreement dated February 19, 2002, among the Debtors,

27 Buyer and Wild Brain, a true and correct copy of which is

28

2

attached hereto as Exhibit "C" (collectively, the "Sale Agreement").

B. The Debtors' sale of the Assets, as that term is defined in the Sale Agreement, to Buyer in accordance with the terms and conditions of the Sale Agreement is in the best interest of the Debtors and their estates.

C. All applicable provisions of Section 363 of the Bankruptcy Code have been satisfied.

D. The terms of the sale of the Assets to Buyer are the result of good faith and arm's length negotiations between the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Wild Brain and Buyer, and the Debtors have determined in the exercise of their sound and reasonable business judgment that the Assets should be sold to Buyer in accordance with the terms and conditions of the Sale Agreement and that the consideration to be realized by the Debtors is fair and reasonable.

E. Buyer's purchase of the Assets from the Debtors in accordance with the terms and conditions of the Sale Agreement is in good faith entitling Buyer to the protections set forth in Section 363(m) of the Bankruptcy Code.

BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Notice of the Motion and of the hearing thereon, as continued from time to time, was given in compliance with Federal Rules of Bankruptcy Procedure 2002 and 6004, which notice is

3

1

2   adequate and proper in the circumstances as to manner, person,

3   content, and time.

4        2.   The terms and conditions of the Sale Agreement are fair

5   and reasonable and were negotiated at arms-length.

6        3.   Buyer has acted, and is acting, in good faith, and is

7   therefore entitled to the provisions afforded to a good faith

8   purchaser under 11 U.S.C. § 363(m).

9        4.   The consummation of the transaction contemplated by the

10  Sale Agreement is in the best interest of the Debtors' bankruptcy

11  estates and their creditors.

12       5.   The consideration to be paid under the Sale Agreement

13  is fair and adequate consideration to the Debtors for the sale of

14  the Assets.

15

16       6.   The terms and conditions of the Sale Agreement and of

17  each component part thereof, including, without limitation, the

18  mutual releases contained therein, are approved, and the Debtors

19  are authorized to execute the Sale Agreement and each component

20  part thereof, including the mutual releases.

21       7.   The Debtors are authorized and directed to take all

22  steps necessary to transfer the Assets to Buyer, as set forth in

23  the Motion and the Sale Agreement, and to enter into, execute,

24  and perform such other incidental agreements, documents, and acts

25  as may be necessary or convenient to consummate the transactions

26  contemplated by the Sale Agreement.

27       8.   Pursuant to the Bankruptcy Code, including, without

28  limitation, 11 U.S.C. §§ 363, the Debtors' sale of the Assets to

4

Buyer shall be free and clear of all liens, claims and interests (except as expressly provided in the Sale Agreement and in this Order), with all such liens, claims and interests to attach to the sale proceeds with the same validity, extent and priority as may now exist, subject to the "carve-out" of 15% as provided for in the Sale Agreement.

9.    Upon the completion of the Closing of the Sale, as defined in the Sale Agreement, all liens, claims, and encumbrances against the Assets will attach to the proceeds of the sale as described in the Sale Agreement, subject to the "carve-out" of 15% as provided for in the Sale Agreement.

10.   Neither the Buyer nor the Assets purchased by the Buyer shall be liable for any debts or claims against the Debtors, the Debtors' bankruptcy estates, or the Assets.

11.   In order to secure payment of the consideration specified in the Sale Agreement to be paid by Buyer for the Assets, (a) without prejudice to Wild Brain's valid, existing and perfected first priority security interest in the proceeds resulting from the sale of the Assets (subject to the "carve-out" of 15% as provided for in the Sale Agreement), the Debtors are hereby granted a first priority security interest in all Assets being transferred to Buyer, and (b) subordinate only to Wild Brain's valid, existing and perfected security interest in the proceeds resulting from the sale of the Assets (subject to the "carve-out" of 15% as provided for in the Sale Agreement), the Debtors are hereby granted a first priority security interest in

5

the proceeds of the Assets being transferred to Buyer.  Buyer shall execute all documents and take all steps necessary and appropriate to perfect such security interests prior to closing.

12.  Nothing set forth hereinabove shall in any manner modify, alter, abridge or in any way affect any rights or interests of Warner Bros., a division of Time Warner Entertainment Company, L.P. ("Warner"), in that certain project known as "The Guardian" pursuant to and in connection with that certain Option Purchase Agreement, dated January 14, 2001, by and between Warner, Larry Schultz Productions, Inc. and SL Productions with respect to "The Guardian."

IT IS SO ORDERED.

Dated: April _11_ , 2002

_Kathleen J Lax_

KATHLEEN T. LAX
UNITED STATES BANKRUPTCY JUDGE

6

# ASSET PURCHASE AGREEMENT

THIS AGREEMENT made this 19th day of November 2001, by and between Stan Lee Media, Inc., a Delaware corporation, and Stan Lee Media, Inc., a Colorado corporation, whose address is PO Box 116, Van Nuys, California 91408 (collectively, the "Debtors"), and SLC, LLC, a California limited liability company to be formed and controlled by Stan Lee, whose address is c/o Arthur Lieberman, Lieberman & Nowak, LLP, 350 Fifth Avenue, #7412, New York, NY 10118 ("Purchaser").

WHEREAS, on February 16, 2001 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of Title 11, of the United States Code ("Bankruptcy Code");

WHEREAS, since the filing of their bankruptcy cases, the Debtors have been operating their business and managing their financial affairs as debtors in possession;

WHEREAS, prior to the Petition Date, the Debtors operated as a digital entertainment studio that developed and distributed branded entertainment properties under the direction of pop-culture icon Stan Lee, co-creator of such classic characters as *Spider-Man*™, the *Incredible Hulk*™ and the *X-Men*™.

WHEREAS, prior to the Petition Date, Stan Lee was employed by the Debtors pursuant to an employment agreement (the "Stan Lee Employment Agreement");

WHEREAS, prior to the Petition Date, Stan Lee contended that the Debtors were in breach under the Stan Lee Employment Agreement and Stan Lee declared the Stan Lee Employment Agreement to be terminated as of January 29, 2001, both of which contentions the Debtors dispute;

WHEREAS, the Debtors believe that without the active involvement of Stan Lee, the Debtors will not be able to exploit the value of certain of the Debtors' assets;

WHEREAS, in order to maximize the value of the Debtors' assets for the benefit of all creditors, the parties hereto desire that certain assets of the Debtors be sold free and clear of all liens, claims and encumbrances to Purchaser pursuant to the terms and conditions set forth herein and subject to Bankruptcy Court approval; and

WHEREAS, the parties hereto desire to set forth certain representations, warranties and covenants made by each to the other, as an inducement to the consummation of the sale, assumption and assignment described herein, and certain additional agreements related to the sale, assumption and assignment;

NOW, THEREFORE, for valuable consideration, including the mutual representations, warranties and covenants herein contained, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

Stan Lee Asset Purchase Agreement
October 29, 2001

EXHIBIT 

# AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment (the "Amendment") To Asset Purchase Agreement dated November 19, 2001 (the "Agreement") is entered into this 20th day of January 2002, by and between Stan Lee Media, Inc., a Delaware corporation, and Stan Lee Media, Inc., a Colorado corporation, whose address is PO Box 116, Van Nuys, California 91408 (collectively, the "Debtors"), and SLC, LLC, a California limited liability company to be formed and controlled by Stan Lee, whose address is c/o Arthur Lieberman, Lieberman & Nowak, LLP, 350 Fifth Avenue, #7412, New York, NY 10118 ("Purchaser").

WHEREAS, on November 19, 2001, the Debtors and Purchaser entered into the Agreement pursuant to which the Debtors agreed to sell certain of the Debtors' assets to Purchaser;

WHEREAS, on or about November 27, 2001, the Debtors filed a Motion For Order To Approve Sale Of Assets Free And Clear Of Liens (the "Motion"), pursuant to which the Debtors sought Court approval of the Agreement.;

WHEREAS, certain creditors filed oppositions to the Motion contending that the Motion seeks to assume and assign certain executory contracts to Purchaser without complying with the requirements of 11 U.S.C. § 365;

WHEREAS, Purchaser has advised the Debtors that Purchaser does not seek an assumption and assignment of the Debtors' executory contracts;

WHEREAS, the Debtors and Purchaser seek to amend the Agreement to exclude the executory contracts from the sale.

NOW, THEREFORE, for valuable consideration, including the mutual representations, warranties and covenants herein contained, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

A.     The following paragraphs of the Agreement are hereby deleted and the Assets described therein are hereby excluded from the Agreement and the sale:

1.1.2.1 The Backstreet Project.

1.1.3.1 Gene Roddenberry's Starship
1.1.3.2 Mary J. Blige
1.1.3.3 X-Treme Heroes
1.1.3.4 Police Force 2220

1.1.3.8 Story Bible
1.1.3.9 Stan Junior


EXHIBIT B

1.1.5.2 Toon Boom
1.1.5.3 Cyberworld
1.1.5.4 Mobius
1.1.5.5 Hollywood Christmas Parade

B.     Notwithstanding the foregoing, all other terms of the Agreement shall remain in full force and effect.

C.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

DEBTORS:

STAN LEE MEDIA, INC.,
a Delaware corporation, and
STAN LEE MEDIA, INC.,
a Colorado corporation

By: _____
     Kenneth S. Williams
     Their Chief Executive Officer

PURCHASER:

SLC, LLC
a California Limited Liability Company

By: _____
     Name: Stan Lee
     Its:

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1     Purchased Assets.  Subject to and upon the terms and conditions set forth herein and subject to Bankruptcy Court approval, the Debtors agree to and will sell, transfer, assign and deliver to Purchaser at the Closing (as hereinafter defined), and Purchaser agrees to and will purchase, acquire and take assignment and delivery of the following, as more particularly described in Exhibit 1.1 hereto (collectively, the "Assets"):

      1.1.1   Produced Properties:

            1.1.1.1   Stanlee.NET web site and portal;

            1.1.1.2   The Accuser;

            1.1.1.3   The Drifter; and

            1.1.1.4   Stan's Evil Clone.

      1.1.2   Co-Brands Produced:

            1.1.2.1   The Backstreet Project.

      1.1.3   Co-Brands In Development:

            1.1.3.1   Gene Roddenberry's Starship;

            1.1.3.2   Mary J. Blige;

            1.1.3.3   X-Treme Heroes;

            1.1.3.4   Police Force 2220;

            1.1.3.5   Chrysallis;

            1.1.3.6   The Stone Giant;

            1.1.3.7   Battle School Tranquility;

            1.1.3.8   Story Bible; and

            1.1.3.9   Stan Junior.

      1.1.4   Developed Deals:

            1.1.4.1   50% interest in Lee Schultz Partnership (complete property schedule attached hereto as Exhibit 1.1.4.1).

### 1.1.5 Other Projects (Undeveloped; Debtors acting as agent for assets only):

    1.1.5.1    DC Comics;

    1.1.5.2    Toon Boom;

    1.1.5.3    Cyberworld;

    1.1.5.4    Mobius;

    1.1.5.5    Hollywood Christmas Parade;

    1.1.5.6    Scuzzle; and

    1.1.5.7    Scuzzle Design.

    1.1.6    All trademarks, copyrights, original artwork and promotional material relating to the Assets.

    1.2    Excluded Assets.  Anything to the contrary in Section 1.1 notwithstanding, the Assets shall exclude:

    1.2.1    All cash, bank deposits and/or cash equivalents of the Debtors.

    1.2.2    All of the Debtors' office equipment, computers, and servers.

    1.2.3    Claims, lawsuits and causes of action of the Debtors.

    1.2.4    Tax refunds and tax attributes.

    1.2.5    Claims for relief under any of the avoiding powers provided for under Chapter 5 of the Bankruptcy Code.

    1.2.6    All books and records of the Debtors that do not relate to the Assets.

    1.2.7    The Debtors' corporate charter or qualifications to conduct business as a corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, transfer books, and other documents relating to the organization, maintenance, and existence of the Debtors as a corporation; or any of the rights of the Debtors under this Agreement.

    1.2.8    The Debtors' interest in Conan Properties, Inc. ("CPI") and any rights or interests, including intellectual property rights, and interests in any of the properties and assets of CPI.

    1.2.9    Any property or interests in property not expressly included in Section 1.1.

1 H 2

## ARTICLE 2

### CONSIDERATION FOR PURCHASE OF ASSETS

2.1    In consideration for the purchase of the Assets described in Sections 1.1.1, 1.1.2, and 1.1.4 (50% interest in Lee Schultz Partnership) other than the those Assets described in Sections 1.1.3 and 1.1.5 above (the "Primary Assets"), the Purchaser shall pay to the Debtors, a percentage of the Gross Income, as defined in Section 2.3 below, received by the Purchaser from the exploitation of the Primary Assets, pursuant to Sections 2.1.1-2.1.3 below.  The percentage of Gross Income to which the Debtors are entitled hereunder shall not be reduced or limited by or subject to deduction, offset or recoupment on account of any expenses or obligations paid or incurred by Purchaser, including without limitation any compensation or benefits paid to, or on behalf of, Stan Lee, subject to the provisions of Sections 2.1.1-2.1.3 below.

2.1.1    Until such time as the allowed secured claim of Interfase is satisfied in full by the Debtors or their estates for payment to Interfase (the "First Target"), the Purchaser shall pay to the Debtors, or their estates, 60% of the Gross Income received by the Purchaser from the exploitation of the Primary Assets.  For example, if the Purchaser is entitled to 50% of the revenue ("Purchaser's Share") from a production (e.g. Lee Schultz Partnership) the Debtors, or their estates, will receive 60% of Purchaser's Share or 30% of the revenues generated from that production.

2.1.2    Upon successfully achieving the First Target and until such time as the Debtors or their estates recover $250,000 from the Purchaser's exploitation of the Primary Assets (the "Second Target"), the Purchaser shall pay to the Debtors, or their estates, 40% of the Gross Income received by the Purchaser from the exploitation of the Primary Assets.

2.1.3    Upon successfully achieving the Second Target and until such time as the Purchaser recovers its advance described in Section 2.1.1 above, wherein Purchaser consented to increase the Debtors' share of the exploitation of the Primary Assets from 40% to 60% of Gross Income received by Purchaser until such time as Interfase's security interest is satisfied in full (the "Third Target"), the Purchaser shall pay to the Debtors, or their estates, 20% of the Gross Income received by the Purchaser from the exploitation of the Primary Assets.

2.1.4    Upon successfully achieving the Third Target and until such time as (a) all allowed claims (excluding any equity interests in the Debtors) are satisfied in full; and (b) the Debtors' estates receive the sum of one (1) million dollars from the exploitation of the Assets over and above the amount necessary to satisfy all allowed claims, the Purchaser shall pay to the Debtors, or their estates, 40% of the Gross Income received by the Purchaser from the exploitation of the Primary Assets.

2.2    In consideration for the purchase of the assets described in Sections 1.1.3 and 1.1.5 above (the "Agency Assets"), the Purchaser shall pay to the Debtors, or their estates, 12% of the Gross Income received by the Purchaser from the exploitation of the Agency Assets.

2.3    For purposes of this Agreement "Gross Income" shall mean and include all income, revenue, benefits and consideration of any kind and in any form derived, directly or indirectly from the Assets including without limitation all rights and interests in any cash, accounts receivable, stock, joint venture interests, partnership interests, limited liability company interests, securities, promissory notes, license agreements, distribution agreements and accounts receivable relating in any way to the exploitation of the Assets including that which is derived from the personal services of Stan Lee including services as a creator, writer, producer, animator or consultant.

2.4    To secure payment of the Consideration provided hereunder, Purchaser shall grant and convey to the Debtors, a first priority security interest in all of the Assets and the proceeds thereof. Purchaser shall execute all documents necessary and appropriate to create and perfect such security interests on or before closing of the sale provided for herein.

2.5    Purchaser shall not be entitled to any revenues derived from any agreements or joint ventures in existence as of February 16, 2001 or agreements created during the Debtors' Chapter 11 cases, including, without limitation, any revenue, profit participation or distribution from any agreement relating to any of the characters, projects and intellectual property rights described in Section 1.1 hereof.

2.6    Purchaser and Stan Lee, individually, shall not be required to share with the Debtors any income or profit resulting from any assets now owned by Stan Lee or hereinafter created, developed or otherwise to be acquired by Stan Lee other than the Assets. The Parties hereby acknowledge that the following trademarks are being conveyed to Stan Lee personally without any obligation of any payment or duty of any kind from Stan Lee or Purchaser:

      2.6.1    Stan Lee Presents;

      2.6.2    Stan's Soapbox; and

      2.6.3    Stan Lee & Design.

2.7    Payment.  The Consideration shall be paid quarterly by Purchaser in cash, certified funds or wire transfer, commencing on January 1, 2002, and each first business day of the following calendar quarters, to the extent that the Assets generate Income. To the extent that the Assets do not generate Income during any quarter, the Purchaser shall not be obligated to make any payments to the Debtors or their estates.

## ARTICLE 3

## PURCHASER

3.1    Limitations.  Purchaser shall be formed and operated for the exclusive and limited purpose of exploiting the Assets assigned to Purchaser hereunder and providing the personal services of Stan Lee. Purchaser's governing documents shall reflect such limited purpose and

shall prohibit Purchaser from conducting any other business. Purchaser's governing documents shall also restrict and prohibit Purchaser from granting any liens or security interests or encumbering any of its assets, including the Assets acquired hereunder, with the sole and exclusive exception of the security interest provided for under this agreement. Purchaser's governing documents shall also restrict Purchaser from borrowing or incurring any indebtedness, with the sole exception of indebtedness created in the ordinary course of Purchaser's business. Purchaser shall not acquire any assets other than the Assets acquired hereunder or acquired in connection with the exploitation of said Assets. Purchaser shall not transfer, convey, assign or create any interest in any of the Assets acquired hereunder or any of the revenue or other consideration or value generated therefrom, without the express written consent of the Debtors and the Creditors Committee.

3.2    Representations, Warranties and Covenants of Purchaser. Purchaser represents and warrants as follows: (a) Purchaser is a duly formed limited liability company organized under the laws of California; (b) Purchaser has all requisite authority to execute and deliver this Agreement and to perform its obligations hereunder; and (c) Purchaser is a bankruptcy remote entity that (i) has an independent member whose vote is required prior to Purchaser declaring bankruptcy, and (ii) such independent member is independent from Purchaser and any equity owner or affiliate of Purchaser. Purchaser and Mr. Lee hereby covenant that for so long as this Agreement is in effect Purchaser shall not and Mr. Lee and his successors and assigns shall not amend the limited liability agreement or certificate of formation of Purchaser.

## ARTICLE 4

## BANKRUPTCY COURT APPROVAL; CLOSING

4.1    Filings with Bankruptcy Court. Promptly after the execution of this Agreement, the Debtors shall file with the Bankruptcy Court a motion for approval of this Agreement, including approval of the sale of the Assets to Purchaser, free and clear of all liens, claims, encumbrances and security interests.

4.2    Closing. Subject to Bankruptcy Court approval, the parties shall close (the "Closing") the transaction contemplated by this Agreement (the "Transaction") within ten (10) days after the entry of said Order as required in Section 4.1 (the "Closing Date"). The Closing shall take place at a location to be agreed upon by the parties, or by facsimile and overnight courier for the convenience of the parties.

4.3    Closing Documents – Purchaser. At the closing and thereafter if requested by Purchaser, the Debtors shall tender to Purchaser fully executed affidavits, bills of sale and other documentation as Purchaser or Purchaser's attorneys may reasonably require for all Assets, including but not limited to the following items:

4.3.1    Bill of Sale covering the Assets being conveyed.

4.3.2   Such other documents as may be reasonably requested by Purchaser in connection with the conveyance of the Assets and the continued effective operation thereof.

4.4    Closing Documents – Debtors.   At the closing and thereafter, Purchaser shall deliver to Debtors all documents necessary to effectuate the terms and provisions of this Agreement.

## ARTICLE 5

### LIEN-FREE SALE

5.1    Upon the Closing and consistent with the Order of the Bankruptcy Court authorizing the sale, all right, title and interest in and to the Assets shall be immediately vested in Purchaser free and clear of any and all liens, claims, encumbrances and security interests of any type whatsoever, pursuant to Bankruptcy Code Sections 363(b) and (f).

## ARTICLE 6

### CONDITIONS TO OBLIGATION TO CLOSE

6.1    Conditions to Obligation To Close.

6.1.1   Conditions to Obligation of the Purchaser.   The obligation of the Purchaser to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

6.1.1.1    Approval by Bankruptcy Court.   Approval of this Agreement by the Bankruptcy Court having jurisdiction over the Debtors' estates, which Order shall include, inter alia, provisions that (i) the sale of the Assets to Purchaser are free and clear of all liens, security interests, claims and other encumbrances, and (ii) Purchaser is a good faith purchaser.

6.1.1.2    Filings with Bankruptcy Court Made.   All filings with the Bankruptcy Court required by Section 3.1 hereof shall have been made by the Debtors and all approvals and Orders sought from such Bankruptcy Court therein shall have been granted.

6.1.1.3    All liens on the Assets shall have been either (i) removed or waived or (ii) made the subject of an Order from the Bankruptcy Court permitting the sale of the Assets free and clear of any liens.

6.1.2   Conditions to Obligation of the Debtors.   The obligation of the Debtors to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

6.1.2.1    The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

)                                )

      6.1.2.2    The Bankruptcy Court shall have issued an Order approving the transactions as described herein.

# ARTICLE 7

## MISCELLANEOUS PROVISIONS

    7.1    Accounting.  The Purchaser shall provide the Debtors, their estates, and the Creditors' Committee with a written accounting, in such reasonable detail as the Debtors, their estates or the Creditors' Committee shall request, prepared in accordance with generally accepted accounting principles, at the end of each calendar quarter of all income and expenses attributable to the Assets. Purchaser shall provide the Debtors, their estates and the Creditors' Committee with such accounting on October 1, January 1, April 1, and July 1 of each calendar year, commencing on October 1, 2001. In the event that accounting reporting date occurs on a Saturday, Sunday or legal holiday, such accounting will be due the first business day thereafter. Debtors, their estates and the Creditors' Committee shall have the right to request an audit of such accountings by giving 10 days written notice to Purchaser. Purchaser and Debtors shall select a mutually, reasonably acceptable firm of accountants to undertake such audit. Purchaser shall make available to such accountants during normal business hours any and all documentation and information reasonably requested by such accountants in connection with such audit. In the event that an audit determines that there is a discrepancy in any amounts paid, the party that has received any excess shall promptly remit such amounts (plus interest at 8% per annum) to the other party. The costs of one audit per year shall be shared equally between Purchaser and Debtors; the costs of any additional audit requested by Debtors shall be borne by the Debtors unless such audit discovers a discrepancy in the Debtors' favor of at least 10% of the expenses or income reported during the audit period, at which time the costs of the audit shall be borne by the Purchaser.

    7.2    Disclosure of Projects.  In the event that the Purchaser enters into any contracts, joint ventures, projects, etc. (hereinafter, "New Project"), with regard to any of the Assets, the Debtors and the Creditors' Committee shall be provided with a copy of all agreements or contracts relating to such New Project and any amendments or modifications thereto.

    7.3    Future of Stan Lee, Individually.  Debtors acknowledge that Stan Lee shall be free, in the future, to pursue other similar or competing economic endeavors and form corporations or companies for those purposes. Stan Lee, however, agrees, on behalf of himself and Purchaser, that he shall exercise reasonable business judgment in pursuing opportunities as they present themselves with respect to the Assets which are the subject of this Agreement and shall use reasonable efforts in attempting to exploit the Assets in light of Stan Lee's other economic endeavors.

    7.4    Severability and Operations of Law.  If any provision of this Agreement is prohibited by the laws of any jurisdiction as those laws apply to this Agreement, that provision is ineffective to the extent of such prohibition and/or is modified to conform with such laws, without

16

invalidating the remaining provisions hereto; and any such prohibition in any jurisdiction shall not invalidate such provision in any other jurisdiction.

7.5    Choice of Law. This Agreement shall be governed by the internal laws (and not the law of conflicts) of the State of California.

7.6    Entire Agreement; Modification. This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No modification, alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party to this Agreement.

7.7    Survival and Binding Agreement. The terms and conditions hereof shall survive the Closing and shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns.

7.8    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.9    Assignment. Neither party to this Agreement may assign any of its rights or delegate any of its responsibilities under this Agreement, without the consent of the other party; provided, however, the Debtors may assign their rights under this Agreement pursuant to an order of the Bankruptcy Court.

///

///

///

///

///

///

///

///

///

///

///

Stan Lee Asset Purchase Agreement                    9
October 23, 2001

7.10   <u>Notices</u>.   All notices, requests, demands, claims and other communications hereunder will be in writing.   Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by personal delivery, by overnight carrier, or by facsimile transaction, as follows:

|  |  |
|---|---|
| <u>If to Debtors:</u> | LEVENE, NEALE, BENDER, RANKIN<br>& BRILL L.L.P.<br>1801 Avenue of the Stars<br>Suite 1120<br>Los Angeles, CA  90067<br>Attn:  Craig M. Rankin, Esq.<br>Fax:  (310) 229-1244 |
| <u>If to Purchaser:</u> | LIEBERMAN & NOWAK, LLP<br>350 Fifth Avenue, #7412<br>New York, NY 10118<br>Attn:  Arthur M. Lieberman<br>Fax:  (212) 947-0417 |
| <u>If to Committee:</u> | STUTMAN, TREISTER & GLATT<br>PROFESSIONAL CORPORATION<br>3699 Wilshire Boulevard, 9th Floor<br>Los Angeles, CA  90010<br>Attn:  Gary E. Klausner, Esq.<br>Fax:  (213) 251-5288 |

7.11   <u>Termination</u>.   In addition to the rights of the parties to terminate this Agreement as set forth elsewhere herein, this Agreement may be terminated at any time, by the mutual agreement of the Debtors and Purchaser.

///

///

///

///

///

///

///

///

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

DEBTORS:

STAN LEE MEDIA, INC.,
a Delaware corporation, and
STAN LEE MEDIA, INC.,
a Colorado corporation

By: _____

Kenneth S. Williams
Their Chief Executive Officer

PURCHASER:

SLC, LLC
a California Limited Liability Company

By: _____

Name: _____

Its: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

DEBTORS.

STAN LEE MEDIA, INC.,
a Delaware corporation, and
STAN LEE MEDIA, INC.,
a Colorado corporation

By: _____

    Kenneth S. Williams
    Their Chief Executive Officer

PURCHASER:

SLC, LLC
a California Limited Liability Company

By: _____
Name: _____ STAN LEE
Its: _____ President

# EXHIBIT 1.1

## SCHEDULE OF ASSETS TO BE SOLD

### 1.1.1 Produced Properties

**Stanlee.NET**

Wholly owned, Production

Stanlee.net is positioned as a portal that showcases interactive entertainment through a variety of web based technologies.  It functions as an online entertainment destination targeting a global community of 6 to 20 year olds comprising the three generations of fans in his 60-year Career.

SLM additionally has secured a number of URLs such as: stanleemedia.com, scuzzle.com, backstreetproject.com, etc.

**Elements of the website:**
- Webisodes – 3 – 6 min flash animations based on wholly-owned or co-branded characters
- Games; easy to difficult
- Community Engines (e.g. user homepages, etc.), databases,
- Activities, comics composer, print engines,
- Stanzine
- News – Updates on the world of Stan Lee, comic books and animation

**The Accuser**
Wholly Owned Produced

**Description:**
Dan Mason, a criminal defense lawyer, could outmaneuver any prosecutor, helping some of the city's most heinous criminals walk with barely more than a slap on the wrist. But when an attack by a disgruntled former client leaves his wife dead and Mason paralyzed, he desperately wishes for the chance to redeem himself. Pulled from the brink of death by a mysterious stranger, he is given an amazing wheelchair, which transforms into a suit of futuristic armor -- not only allowing Mason to walk again, but dramatically multiplying his strength and providing him an arsenal of exotic weapons. Mason takes to the streets, vowing to bring the criminals he once set free to justice.

**Webisodes:**
22 Webisodes produced and originally distributed by Shockwave.com. Shockwave.com maintains limited back end in property until recoupment of licensing fees.

Ready for 2nd Cycle domestic syndication.

The rest of the world is available for primary exploitation (Subject to Fox Kids Latin America Agreement)

**Games:**
Flash Based, Interactive Games
The Accuser's Revenge

**Print Engines:**
SLM has created a series of flash based print engines that have the ability to print a number of fun and different paper-based activities:
- Calendars
- Trading Cards
- Envelopes
- Greeting Cards

**TV Bible**
A television script has been written.

**The Drifter**

Wholly Owned in Production

**Description:**

Matthew Zane, code named "Drifter", is a man from nightmare future 2074 who has survived "The Crash," a worldwide computer meltdown that has killed 423 million people worldwide and caused another two billion to go insane within twenty-four hours. Using untested time travel research, Zane arrives in present day 2000. His mission is to prevent key developing technologies from dominating mankind's descendants' lives and crushing the human spirit. As the ``Drifter" pursues his goal, he must evade security agents, also from the future, intent on his death.

**Webisodes:**

12 Webisodes ordered from scifi.com
8 of 12 Webisodes completed in Macromedia Flash

> **Deal Points:**
> Sci Fi pays ½ of the production costs for all 12 webisodes up to $12,500 per webisode
> Sci Fi receives 14-week exclusive distribution period
> Sci Fi and SLM share revenues generated from syndication 50/50

**Games:**

Flash Based, Interactive Games
Drifter Racer
AOL

**TV Treatment**

Live action TV treatment available

## Stan's Evil Clone

Wholly Owned Produced

**Description:**

Stan clones himself, but something goes horribly wrong producing an evil, and highly opinionated, version of himself.

**Interactive Comic Shorts:**

20 comic shorts produced in Macromedia Flash

**Screen Friends:**

The ScreenFriends Inter(Face)™ delivers an entertaining and creative way for people to interact with their computers using vocal dialogue, instead of a mouse or keyboard. ScreenFriends work with just about any PC computer and there is no training or special equipment required. Users can choose from an ever-expanding set of characters that appear on the computer screen, ready and able to operate the entire system. ScreenFriends can open computer programs, search the web and help users buy merchandise online.  SLM created an Evil Clone ScreenFriend that talks back in hilarious rants from the real Stan Lee.

## 1.1.2 Co-Brands Produced

### Backstreet Project

Co-Branded Produced

**Description:**
``The Backstreet Project,'' an animated series portraying the Backstreet Boys as Cyber Crusaders, each with unique powers to protect the Earth.

### Deal Points
- SLM entitled to recoup costs, thereafter 65/35 revenue split between BSB/SLM
- Parties co-own all rights
- Exploitation subject to joint control

**Webisodes:**
8 Webisodes produced in Macromedia Flash
2 minute concert introduction produced and used on their last tour

### Backstreet Project.com:
The BackstreetProject.com is a fully functional entertainment portal revolving around the superhero alter egos of the famous BackStreet Boys Music Group.  This website has all the elements of stanlet.net.

### Elements of the website:
- Webisodes
- Games; easy to difficult 4-5 games
- Activities, comics composer, print engines,

### Graphic Novel:
34,000 copies of first edition were sold at seven venues on the last BSB concert tour.
10,000 copies of first edition sold on line.
Approximately 45,000 2nd edition sold at retail.
First $300,000
Approved Script for 2nd comicbook

### 1.1.3 Co-Brands in Development

**Gene Roddenberry's Starship**
Co-Branded in Development

**Description:**
SLM has partnered with the estate of sci-fi legend and "Star Trek" creator Gene Roddenberry to develop a newly discovered original Roddenberry project, "Starship", into a global, multimedia entertainment franchise under the collective brands of Roddenberry and Stan Lee.

**Deal Points**
- SLM and Majel Roddenberry / John Semper entitled to 50/50 revenue split after SLM recoups costs;
- Joint control of offline exploitation;
- Reversion rights exist if certain performance targets are not met;
- Roddenberry and Semper have claimed anticipatory breach of agreement in light of SLM's suspension of operations.

## Mary J. Blige

Co-Branded in Development

**Description:**

SLM developed new animated franchise with R&B songstress Mary J. Blige to portray her as a fantasy superhero.  Series is heavily urban, with Mary portrayed as a high tech "hero of the hood."

### Deal Points

- SLM and Mary J. Blige entitled to 50/50 revenue split after SLM recoups costs;
- Joint control of offline exploitation;
- Minimum of 60 minutes of production required by June 9, 2001.

**Webisodes:**

2-minute concert introduction produced and used on her last tour.

**Website**

Gated
Limited activities
Small Game

## X-Treme Heroes (OMS)
Co-Branded in Development

**Description:**

A five-year agreement has been forged with Kentucky-based sports management firm OMS Ltd. to create superhero alter-egos for Mike LaRocco, Ben Bostrom, Missy Giove, Sebastian Tortelli, Scott Summers and Lance Isaac, racing stars who are known in the world of two-wheeled extreme sports, reaching an estimated audience of over 450 million recorded annual impressions. Under the agreement, the companies will jointly develop and own "animated brand extensions" of these popular athletes for all media exploitation, with Stan Lee Media retaining the sole right to distribute projects for Internet, home video, cable, satellite and other mediums, including traditional licensing and merchandising.

### Deal Points
- SLM and OMS entitled to 50/50 revenue split after SLM recoups costs;
- SLM control of exploitation, subject to some consents from OMS;
- SLM not obligated to produce under agreement prior to obtaining sufficient sponsorship revenues;
- OMS has claimed anticipatory breach in light of SLM's suspension of production operations.
-

## Police Force 2220
Co-Branded in Development

**Description:**

Set in the year 2220, ``POLICE FORCE 2220'' is a futuristic vision of the world of crime fighting that focuses on an elite trio of police officers as they struggle to save the world from global crises of the 23rd Century. Langley and Lee said they intend to expand the ``POLICE FORCE 2220'' franchise to live-action television and feature film while building a global audience on the Internet.

### Deal Points
- SLM and Langley entitled to 50/50 revenue split after recoups costs;
- SLM controls online media exploitation, Langley controls offline media exploitation;
- Webisodes to be initially co-distributed on stanlee.net and crime.com.

### TV Treatment
An animated television treatment has been created based upon this property.

## Chyrsallis

Wholly owned in Development

**Description:**

In the far future, in a barbaric world of sorcery and swords, a sonically gifted woman searches
For a cure for her tribe and discovers there is a mystery to her origins...

## The Stone Giant

Wholly owned in Development

**Description:**

An LAPD detective left to die in a toxic dump, gains the power to temporarily transform into a
Colossal crime-fighting creature of stone, tattooed with mysterious rune-like symbols of
Unknown origin.

### Battle School Tranquility

Developed Property

**Description**

With an impending alien invasion, Earth's last hope is a group of telekinetically gifted teenagers
Training to use alien battle suits at a special academy on the moon.

### Story Bible

Character development

### Television

Are in final discussions regarding entering into a development agreement with FoxKids for the
development and production of a pilot based upon the property.

## Stan Junior

Developed Property

**Description**

Stan Jr. is an animated series which tells stories on two levels: (1) the everyday life of
contemporary Stan Jr., portrayed in traditional cartoon animation style, and (2) the world of Stan
Jr.'s imag-adventures, where even the most "common" events become uncommon, amazing
adventures when filtered through Stan Jr.'s psyche.

Television treatment available.

SLM is in a 50/50 partnership with TLC to produce a pilot and pitch series.

)                                    )

## 1.1.4 DEVELOPED DEALS

### Lee Schultz Partnership
Developed Property

### Deal Description
SLM and Larry Schultz are partners in a joint venture relating to the production and distribution of a number of properties (see attached schedule). Many of these properties are significantly developed and ready to be pitched to television and motion picture studios. For instance, Tribune Entertainment has expressed significant interest in a possible television series surrounding the "Diabella" property, and we have received a great deal of interest with respect to the "I, Werewolf" property.

## 1.1.5 OTHER PROJECTS

### DC Comics
Developed Property
_____

**Deal Description:**
SLM has entered into an agreement with DC Comics, whereby Stan Lee has agreed to create
"alternate versions" of the major DC Comics characters (Superman, Batman, Wonder Woman,
The Flash, etc.) to be published in a special edition series, currently entitled "What If Stan Lee
had Created the DC Universe." Under the terms of this deal, SLM receives a royalty of 5.0% of
the cover price on net sales of the first 200,000 copies of such issue; and 6.0% of the cover price
on net sales of such issue in excess of 200,000 copies.

### Toon Boom
Developed Contract
_____

**Deal Description:**
SLM has entered into an agreement with the Canadian software company, Toon Boom, creators
of US Animation, the standard in traditional animation digital ink and paint programs. Pursuant
to the terms of this agreement, SLM has non-exclusive right to distribute US Animation software
in the U.S. SLM has obligations to form and execute a marketing plan for the software, and to
develop a user interface for the product. SLM also owns warrants to acquire up to 1,044,888
shares of Toon Boom Technologies, Inc., at Canadian $.70 per share, of which 348,296 are
currently vested.

### Cyberworld
Developed Contract
_____

**Deal Description:**
SLM owns warrants to purchase 250,000 shares of Cyberworld International, Inc. at $1.00 per
share and 250,000 shares at $2.00 per share..

## Mobius
Developed MOU

**Deal Description:**

SLM is in advanced negotiations with Global Digital Development, Ltd. regarding the production of a 3-D CGI animated movie, written by Stan Lee and the world-famous French artist, "Mobius." Under the terms of this anticipated agreement, SLM would receive a 15% backend after the producer recovers its hard, out-of-pocket costs associated with producing and distributing the film. SLM would also control merchandising for the film and would receive a 20% fee for such services.

## Hollywood Christmas Parade
Developed Contract

**Deal Description:**

SLM has entered into an agreement with the Hollywood Chamber of Commerce granting SLM certain exclusive rights (including broadcast rights, merchandising rights, etc.) relating to the Hollywood Christmas Parade. The agreement grants these rights through to the 2005 parade. SLM is required to pay $250,000, and certain guaranteed revenue amounts must be generated in each year to maintain the rights. SLM and the Hollywood Chamber of Commerce are currently in a dispute regarding purported breaches by both parties in connection with the 2000 parade.

**EXHIBIT 1.1.4.1**

**Lee-Schultz Property Schedule**

Guardians
Haywire (aka Fixers)
War Is Heck
Braindead
Fissure
Op: Alien
Planet
Captain Super
Bots/The Retrievers
Adjuster
Con Man and the Cop
Guardians
Micro-Man/Micro-Team
Missing Link
Pandora's Box
The Power
Tomorrow Man
Triple Helix
Tomorrow
Demolisher
Death Hunt
Talon
Raiders of Space
The Visitor (Quarantine)
Chairman
Cougar
Femizons
Hobson's Choices
The Un-Humans
Diabella
Tarantula
I-Werewolf
X-Isles
The Terminal
Vindicator
Decoy
The Lighthouse
Disaster Blasters
Stronghold
Mumbo Jumbo
Rocker

# AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS AMENDMENT TO ASSET PURCHASE AGREEMENT (the "Amendment") made this _____ day of February 2002, by and between Stan Lee Media, Inc., a Delaware corporation, and Stan Lee Media, Inc., a Colorado corporation, whose address is PO Box 116, Van Nuys, California 91408 (collectively, the "Debtors"), and SLC, LLC, a California limited liability company to be formed and controlled by Stan Lee, whose address is c/o Arthur M. Lieberman, Lieberman & Nowak, LLP, 350 Fifth Avenue, #7412, New York, NY 10118 (the "Purchaser"), and Wild Brain, Inc. ("Wild Brain").

WHEREAS, the Debtors and Purchaser entered into an asset purchase agreement (the "Agreement") dated November 19, 2001.[1]

WHEREAS, all of the right, title and interest of Interfase Capital, L.P. ("Interfase") in that certain debtor in possession loan agreement and all documents related thereto (collectively, the "DIP Loan") entered into with the Debtors as of April 9, 2001, and approved by that certain Final Order Approving Emergency Motion Pursuant To Local Bankruptcy Rule 9075-1(1) For Authority To Obtain Post-Petition Financing entered on May 3, 2001, have been assigned to Wild Brain.

WHEREAS, Wild Brain holds liens on the Assets and will not consent to a sale free and clear of its liens absent modifications to the Agreement.

WHEREAS, the Debtors, Purchaser, and Wild Brain are willing to modify their respective rights that are otherwise set forth in, or are affected by, the Agreement in order to reach an agreement.

NOW, THEREFORE, for valuable consideration, the parties hereby agree as follows:

## ARTICLE 1
## MODIFICATION OF CONSIDERATION FOR PURCHASE AND SALE OF ASSETS

1.1    All monies payable to the Debtors or their estates under the Agreement shall, subject to Section 1.3 herein, be paid by the Debtors or their estates within three (3) business days of receipt to Interfase's assignee, Wild Brain, at the address set forth in Section 6.2 herein, until the claim of Interfase arising out of the DIP Loan (the "Claim") is paid in full. The Claim shall consist of all principal and all accrued and accruing interest, together with all attorneys' fees and costs allowable under the DIP Loan (including, insofar as allowable under the DIP Loan, all legal fees and costs reasonably incurred by Wild Brain arising out of or relating to the Claim and in connection with the

---

[1]    All undefined capitalized terms herein shall have the same definition as those set forth in the Agreement.

EXHIBIT_____ C

negotiation and documentation of this Amendment); provided, however, that nothing contained herein shall limit Wild Brain's right to recover attorneys' fees and costs, in the event Wild Brain is required to incur such fees and costs to enforce its rights under this Amendment.

     1.2    Subject to Section 1.3 herein, all payments received by the Debtors or their estates for Agency Assets shall be payable to Wild Brain until such time as the Claim has been satisfied in full.

     1.3    Until such time as the Claim is fully satisfied (defined in the Agreement as the "First Target"), fifteen percent (15%) of all payments made by the Purchaser toward satisfaction of the First Target and for the Agency Assets shall be retained by the Debtors or their estates (the "Retained Funds"). The Retained Funds shall be held by the Debtors and their estates free and clear of the Claim, and shall be applied towards administrative expenses of the Debtors and their estates, not including Wild Brain's administrative expenses. After achieving the First Target and until achieving the Third Target, the Debtors and their estates shall retain free and clear of any claim by Wild Brain, all payments of Gross Income made by the Purchaser to the Debtors or their estates.

     1.4    After successfully achieving the Third Target, and after all allowed claims (excluding any equity interests in the Debtors) are satisfied in full, Wild Brain shall receive on a pro rata basis 5% of all monies received and applied towards satisfying the obligation to pay $1 million set forth in Section 2.1.4 of the Agreement.

     1.5    After the Purchaser has satisfied all payment obligations to the Debtors arising under the Agreement, Wild Brain shall receive, on a pro rata basis, 2.75% of the Gross Income received by the Purchaser from the exploitation of the Assets.

## ARTICLE 2
## RELEASE BY DEBTORS

     2.1    Effective upon Bankruptcy Court approval of the Agreement and this Amendment, and except for the rights, obligations and liabilities created by the Agreement and this Amendment, (a) the Debtors and their estates hereby release and discharge absolutely and forever Wild Brain, its officers, directors, employees, agents, assigns, predecessors in interest (including, but not limited to Interfase), successors in interest, stockholders, and counsel, and (b) except for any rights, obligations and liabilities related to or arising under or out of the Claim and/or Wild Brain's rights in, under or to the Claim, Wild Brain hereby releases and discharges absolutely and forever the Debtors, their officers, directors, employees, agents, assigns, predecessors in interest, successors in interest, stockholders and counsel, of and from any and all claims, known or unknown, suspected or unsuspected, of any kind and nature whatsoever which now exist, hereafter may exist or heretofore have existed. It is the intention of the Debtors and their estates and Wild Brain that the foregoing release be effective as a full and final accord and satisfaction and settlement and release of all of the matters released therein. In furtherance of such intention, the Debtors and their estates and Wild Brain acknowledge that they may hereafter discover facts in addition to, or different from, those which they now believe to

be true, but notwithstanding such discovery the release herein given shall be and remain in effect as a full and complete general release.

2.2    The Debtors and their estates and Wild Brain expressly waive any and all rights that may be granted to them pursuant to Section 1542 of the California Civil Code, which Section provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which, if known by him, must have materially affected his settlement with the debtor.

ARTICLE 3
RECONVEYANCE RIGHTS

3.1    Within eighteen months after a Bankruptcy Court order is entered approving the Agreement and this Amendment, the Purchaser agrees that it will endeavor in good faith to have signed development deals in arms-length transactions with third parties with respect to no less than three of the projects described in Sections 1.1.1-1.1.5 of the Agreement (the "Initial Development Projects"). The Purchaser further agrees that within the next succeeding eighteen months, and for every succeeding eighteen month period thereafter, it will endeavor in good faith to have entered into signed development deals in arms'-length transactions with third parties with respect to no less than two additional projects described in Sections 1.1.1-1.1.5 of the Agreement for each eighteen month period (the "Subsequent Development Projects") until such time as all the projects referenced in the Agreement are either developed or abandoned by the Purchaser. In the event one of the above-described Initial or Subsequent Development Projects is the subject of a development deal that does not result in the project being placed in production, and that project becomes the subject of an additional signed development deal, it will not be counted towards satisfying the threshold development projects for the eighteen month time period that is then applicable. Further, if a project or projects that were the subject of development deals do not go into production, the number of development deals needed during the then applicable eighteen month period will increase by the number of failed development deals.

3.2    In the event that the Purchaser has not entered into the requisite number of Initial Development Projects or, as the case may be, Subsequent Development Projects, within the permitted time periods, upon written request of the Debtors or their estates or Wild Brain (if its claim has not been fully satisfied), the Purchaser shall within thirty days of the request reconvey the Assets (other than the Lee Schultz Partnership projects described in Section 1.1.4.1 of the Agreement) to the Debtors or their estates, or if abandoned by the Debtors or their estates, to Wild Brain, at no cost to the party requesting the reconveyance. The Purchaser shall not be obligated to reconvey any of the Assets that are the subject of a pending development deal entered into in good faith in an arms'-length transaction with a third party. However, the Purchaser will be required to reconvey the Assets (other than the Lee Schultz Partnership projects described in Section 1.1.4.1 of the Agreement) that were subject to a development deal if said development deal(s) is

514457.06 01                                              - 3 -

subsequently terminated, abandoned, or becomes inactive for a period of not less than three months.

## ARTICLE 4
## WILD BRAIN BID RIGHTS

The Purchaser agrees that in connection with any prospective development project for the Assets, save for those in which the other party to the project has an existing in-house animation studio and has determined that the prospective project will be developed in-house, the Purchaser will advise the party that it recommends Wild Brain for the animation work to be done in connection with the project and that Wild Brain should be afforded the opportunity to bid on the project. Wild Brain shall provide the Purchaser with information and a contact person, which information and contact person may change from time to time, for dissemination to the prospective parties to the development projects. Wild Brain shall be notified within three (3) business days after it has been recommended for each prospective project. Subject to its having performed its obligations hereunder, Purchaser shall have no obligation to Wild Brain in the event that the parties to the prospective projects decline to utilize Wild Brain's services.

## ARTICLE 5
## CONTINUING SECURITY INTEREST

Wild Brain shall continue to have a perfected security interest in all assets of the Debtors and their estates that are the subject of the security agreement entered into in connection with the DIP Loan, and nothing contained herein shall limit Wild Brain from exercising any and all of its rights and remedies available to it thereunder. The Debtors and their estates acknowledge that they are currently in default under the DIP Loan and have no defenses, offset or recoupment rights with respect to the claims of Wild Brain arising thereunder.

## ARTICLE 6
## MISCELLANEOUS

6.1    This Amendment embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements, and understandings relating to the matters provided for herein. No modification, alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party to this Amendment. In the event of a conflict between the terms of this Amendment and the Agreement, the terms of this Amendment will be controlling. Save for the terms set forth in this Amendment, the terms of the Agreement remain in full force and effect.

6.2    All notices to be given under the Agreement and arising under this Amendment shall be provided to the persons set forth in Section 7.10 of the Agreement and to:

514457.06 01                              - 4 -

Wild Brain, Inc.
2650 18th Street
San Francisco, California 94110
Attn: Christopher E. Reggie, Esq.
Fax: (415) 437-2256

     - and -

Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067
Attn: Howard J. Steinberg, Esq.
Fax: (310) 203-7199

6.3    Wild Brain may assign any of its rights or delegate any of its responsibilities under this Amendment. The Purchaser and Debtors cannot assign any of their rights or delegate any of their responsibilities without the consent of all parties hereto; provided, however, that consent of the parties is not necessary if the Debtors assign their rights under this Amendment pursuant to an order of the Bankruptcy Court.

6.4    Wild Brain shall receive the written accountings referenced in Section 7.1 of the Agreement until such time as the Claim is satisfied in full.

6.5    Section 7.3 of the Agreement shall be modified to read as follows:

> 7.3    <u>Future of Stan Lee, Individually</u>. Debtors acknowledge that Stan Lee shall be free, in the future, to pursue other similar or competing economic endeavors and form corporations or companies for those purposes. Stan Lee, however, agrees, on behalf of himself and Purchaser, that he shall exercise reasonable business judgment in pursuing opportunities as they present themselves with respect to the Assets which are the subject of this Agreement and shall use reasonable efforts in attempting to exploit the Assets notwithstanding Stan Lee's other economic endeavors.

6.6    This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.7    If any lawsuit is commenced for breach of this Amendment, the prevailing party shall be entitled to recover from the other party its costs, expenses, and reasonable attorneys' fees.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first written above.

DEBTORS:

STAN LEE MEDIA, INC.,
a Delaware corporation, and
STAN LEE MEDIA, INC.,
a Colorado corporation


By:_____
Kenneth S. Williams
Their Chief Executive Officer


PURCHASER:

SLC, LLC
a California Limited Liability Company


By:_____
Name:_____STAN__LEE_____
Its:_____President_____


WILD BRAIN:

WILD BRAIN, INC.


By:_____
Name:_____
Its:_____

DEBTORS:

STAN LEE MEDIA, INC.,
a Delaware corporation, and
STAN LEE MEDIA, INC.,
a Colorado corporation


By: _____
Kenneth S. Williams
Their Chief Executive Officer


PURCHASER:

SLC, LLC
a California Limited Liability Company


By: _____
Name: _____
Its: _____


WILD BRAIN:

WILD BRAIN, INC.

By: _____
Name: Chris Ruce_____
Its: VP Business Affairs_____

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action; my business address is: 1801 Avenue of the Stars, Suite 1120, Los Angeles, California 90067.

On 1 4/2, 2002, I served the foregoing document(s) described as:
ORDER GRANTING MOTION FOR ORDER TO APPROVE SALE OF ASSETS FREE AND CLEAR OF LIENS
on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California, addressed as follows:

See attached service list.

__X__ (By Mail) I caused such envelope with postage thereon, fully prepaid to be placed in the United States mail. Executed on 1 4/2, 2002, at Los Angeles, California.

_____ (By Federal Express/Overnight Mail) I caused such envelope to be delivered by Federal Express (or Express Mail), next business day delivery to the offices of the addressee. Executed on _____, 2002, at Los Angeles, California.

_____ (By Facsimile) I caused said document to be sent via facsimile. Executed on December ___ 2002, at Los Angeles, California.

_____ (By personal service) I caused such envelope to be delivered by hand to the offices of the addressee. Executed on _____, 2002 at Los Angeles, California.

_____ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__x__ (Federal) I declare that I am an employee in the offices of a member of the State Bar of this Court at whose direction the service was made.

Bambi Clark

Special Notice ¬ In·re Stan Lee Media

Office Of The U.S. Trustee
21051 Warner Center Drive, Ste 115,
Woodland Hills 91367

Stan Lee Media, Inc. (1935-1)
c/o Junko Kobayashi
5050 Klump Avenue, #302
North Hollywood, CA 91601

Committee Counsel
Gary Klausner, Esq. (1935-106)
Stutman, Treister & Glatt
3699 Wilshire Blvd. #900
Los Angeles, CA 90010

SECURITIES & EXCHANGE COMM.
Sandra Lavigna (1935-115)
5670 Wilshire Blvd., #1100
Los Angeles CA 90036

Counsel for Stag/Salim
Penelope Parmes Esq (1935-116)
Rutan & Tucker
611 Anton Blvd., 14th Floor
Costa Mesa, CA 92626-1998

Jeffrey A. Krieger, Esq. (1935-31)
Greenberg, Glusker, Fields, Claman &
Machtinger
1900 Ave. of the Stars #2100
Los Angeles, CA 90067

Attorneys for CSC, LLC
Yann Geron, Esq. (1935-32)
Geron & Associates, PC
317 Madison Ave., #1421
New York, NY 10017

Counsel for Elliott Associates
Robert M Novick Esq (1935-33)
Kasowitz, Benson, et al
1633 Broadway
New York, NY 10019

Attorneys for Fidelity Leasing
Susan Kay Breen (1935-34)
Hemar, Rousso & Heald
15910 Ventura Blvd., 12th Floor
Encino CA 91436-2829

Counsel for U.S. Bank
Wedell G Kusnerus Esq
U.S. Bancorp Legal Dept
PO Box 2200
Portland, OR 97208-2200

Counsel for Warner Brothers
Wayne M. Smith Esq
Warner Bros. (1935-35)
4000 Warner Blvd
Burbank, CA 91522

Attorneys for Augustine Funds, LP
Ira D. Kharasch, Esq. (1935-36)
Pachulski, Stang, Ziehl, Young & Jones
10100 Santa Monica Blvd., #1100
Los Angeles, CA 90067

Counsel for Frontera Corp.
Wayne Terry Esq (1935-37)
Mitchell Silberberg & Knupp
11377 West Olympic Blvd.
Los Angeles, CA 90064-1683

Counsel for Toon Boom Technologies
Nanette D Sanders (1935-38)
Snell & Wilmer
1920 Main St., Ste 1200
Irvine CA 92614-7060

Attorneys for Shafton, Inc.
Steven W. Weinshenk Esq (1935-117)
Cantor & Weinshenk
16830 Ventura Blvd., #351
Encino, CA 91436-1796

RSN
James Helton Joseph Esq (1935-109)
Klett, Rooney et al
One Oxford Centre, 40th Floor
Pittsburgh, PA 15219-6498

Counsel for Interchange Capital
Jeffrey A Clark Esq (1935-110)
Clark & Kramer
2999 Overland Ave., #204
Los Angeles, CA 90064-4243

Counsel for Fox Latin America Channel
David M Posner Esq (1935-111)
Squadron, Ellenoff et al
551 – 5th Ave
New York, NY 10176

Counsel for GE Capital
Marshall F Goldberg Esq (1935-112)
Glass & Goldberg
21700 Oxnard St., Ste 430
Woodland Hills, CA 91367-3665

Counsel for Interfase Capital LP
Lawrence Peitzman, Esq. (1935-113)
Peitzman, Glassman & Weg LLP
1900 Ave. of the Stars, #650
Los Angeles, CA 90067

Special Corporate Counsel
Skadden Arps Slate Meagher etc (1935-12)
Attn: Jamie Edmonson, Esq.
300 S. Grand Ave., #3400
Los Angeles, CA 90071-3144

Counsel for Administaff
Leslie Cohen/Jason Pomerantz (1935-114)
Liner, Yankelevitz
3130 Wilshire Blvd., #200
Santa Monica, CA 90403

RSN - (1935-118)
James Joseph/Erin Milliken
Klett Rooney Lieber & Schorling
One Oxford Centre, 40th Floor
Pittsburgh, PA 15219-6498

*Counsel for American Express*
*William J Becket Esq*
*16 General Warren Blvd.*
*POB 3001*
*Malvern, PA 19355*

Counsel for Hill & Knowlton - (1935-121)
David A Schwartz/Elizabeth L Rosenblatt
Irell & Manella
1800 Avenue of the Stars, #900
Los Angeles, CA 90067

Counsel for Hollywood Chamber Commerce
Bennett L. Silverman Esq (1935-124)
Gibson, Dunn & Crutcher
333 S. Grand Ave
Los Angeles, CA 90071

Counsel for Wild Brain, Inc.
Howard J. Steinberg/Eric R. Wilson
Irell & Manella
1800 Avenue of the Stars, #900
Los Angeles, CA 90067

Counsel for Warner Bros.
Jon L.R. Dalberg, Esq.
Andrews & Kurth LLP
601 S. Figueroa Street #1725
Los Angeles, CA 90017-5722

COUNSEL FOR BOWNE OF L.A.
Gail B Price, Esq.
Bronwen Price
400 South Parkwood Ave
Pasadena, CA 91107

RSN - American Express
1851 East First Street (1935-119)
Sixth Floor
Santa Ana CA 92705

Counsel for Hill & Knowlton (1935-122)
Neal H Klausner/Amy Bennett
Davis & Gilbert
1740 Broadway
New York, NY 10019

~~Counsel for Lynne Cohen & Cohen PR~~
~~Barab, Abrams & Coate~~
~~9606 Santa Monica Blvd., 3rd Flr~~
~~Beverly Hills, CA 90210~~
(Delete per letter of 1/25/02)

SLC, LLC
c/o Arthur Lieberman
Lieberman & Nowak
350 Fifth Avenue #7412
New York, NY 10118

Counsel for Exodus Communications
Lawrence M. Schwab/Gaye N. Heck
Bialson, Bergen & Schwab
2600 El Camino Real, Suite 300
Palo Alto, CA 94306

Counsel for Douglas Emmett Realty Fu
1997 - (1935-120)
Don Sherwood/Christian S. Molnar
11990 San Vicente Blvd. #240
Los Angeles, CA 90049-5004

Counsel for Deborah Schlichting (1935-12
Barry R Gore Esq
Clarkson, Gore & Marsella
3424 Carson St., #350
Torrance, CA 90503

Counsel for PFSC/SFC CAPITAL
Alan D. Halperin Esq
Halperin & Assoc
152 W. 57th St
New York, NY 10019-3310

Counsel for MBR Productions
Marvin D. Heileson, Esq.
Morrison & Foerster LLP
555 West Fifth Street #3500
Los Angeles, CA 90013-1024

**Counsel for MBR Productions**
Jeffrey M. Kayes, Esq.
Morrison & Foerster
555 W. Fifth St., #3500
Los Angeles, CA 90013-1024

Attorney or Party Name, Address and T    hone Number    FOR COURT US    LY

Martin J. Brill (SBN 53220)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.,
1801 Avenue of the Stars, Suite 1120
Los Angeles, CA  90067
(310) 229-1234
*Attorney for: Chapter 11 Debtor and Debtor in Possession*

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

In re:
STAN LEE MEDIA, INC., a Delaware corporation,

|  |
|---|
| Chapter 11 Case Number |
| SV-01-11329-KL |

Debtor.

STAN LEE MEDIA, INC. a Colorado corporation,
                                    Movant(s) / Plaintiff(s),

CHAPTER 11 CASE NUMBER
SV – 01-11331-KL

(Jointly Administered)

vs.

[  ] REFERENCE NUMBER
[ ] ADVERSARY NUMBER

Respondents(s) / Defendants(s).

## NOTICE OF ENTRY JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:
1.    You are hereby notified, pursuant to Local Bankruptcy Rule 116(1)(a)(iv), that a judgment or order entitled *(specify)*:
**ORDER GRANTING MOTION FOR ORDER TO APPROVE SALE OF ASSETS FREE AND CLEAR OF LIENS** was entered on *(specify date)*:
2.    I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment of the persons and entities on
the attached service list on *(specify date)*:

Office Of The U.S. Trustee
21051 Warner Center Drive, Ste 115
Woodland Hills 91367

Stan Lee Media, Inc. (1935-1)
c/o Junko Kobayashi
5050 Klump Avenue, #302
North Hollywood, CA 91601

<u>Counsel to the Debtors</u>
David B. Golubchik, Esq.
Levene, Neale, Bender, Rankin & Bri
1801 Ave. of the Stars #1120
Los Angeles, CA 90067

<u>Committee Counsel</u>
Gary Klausner, Esq.
Stutman, Treister & Glatt
3699 Wilshire Blvd. #900
Los Angeles, CA 90010

<u>Counsel for Wild Brain, Inc.</u>
Howard J. Steinberg/Eric R. Wilson
Irell & Manella
1800 Avenue of the Stars, #900
Los Angeles, CA 90067

<u>Counsel for Warner Bros.</u>
Jon L.R. Dalberg, Esq.
Andrews & Kurth LLP
601 S. Figueroa Street #1725
Los Angeles, CA 90017-5722

SLC, LLC
c/o Arthur Lieberman
Lieberman & Nowak
350 Fifth Avenue #7412
New York, NY 10118

DATED:

**JON D. CERRETTO**
Clerk of the Bankruptcy Court

by: _____
Deputy Clerk

If a judgment is by default, a copy of the judgment must be attached to this notice.
*This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California*

# Exhibit 7

V3541 D448



### ASSIGNMENT OF COPYRIGHT

This Assignment of Copyright (this "Assignment") is entered into as of July 31, 2006, by and between Stan Lee Media, Inc., a Delaware Corporation, having its principal place of business at c/o Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los Angeles, California, United States, 90067 ("Assignor") and QED Productions LLC, a Delaware Limited Liability Company having its principal place of business at 9440 Santa Monica Boulevard, Suite 620, Beverly Hills, California, United States, 90210 (the "Assignee").

### RECITALS

WHEREAS, Assignor is the owner of the works (the "Works") on the Copyright Office registration for the Works listed on Schedule A.

WHEREAS, Assignee and Assignor desire to vest complete ownership in the Works in Assignee and Assignee therefore desires to acquire all rights owned by Assignor in the Works and Assignor desires to assign same to Assignee to accomplish this goal.

### AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1. *Assignment of Works.* Assignor hereby assigns all of Assignor's rights, title and interest worldwide in and to the Works to Assignee, subject to all mortgages, liens, claims, restrictions and encumbrances, which rights shall include, without limitation, all copyrights, copyright registrations, copyright applications and all associated rights in the Works. To the extent permitted under applicable law, Assignor waives all moral rights of authorship in the Works.

2. *Valid Assignment.* Assignor represents and warrants that the Works are original and that Assignor has never transferred, licensed or assigned any rights in or to the Works to any other person or entity other than Assignee, and has all necessary consents, rights and authority to make this Assignment.

3. *Cooperation.* Assignor will make all reasonable efforts to assist Assignee, at Assignee's expense, in securing, perfecting, protecting and registering the copyright transferred in this Assignment.

[Remainder of this page left intentionally blank]

V3541 D448   Page 1

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the date first written above.

Stan Lee Media, Inc. (Assignor)

By: Junko Kobayashi
Its: Agent for Stan Lee Media, Inc.

QED Productions, LLC (Assignee)

By: Gill Champion
Its: President

V3541 D448 Page 3

## SCHEDULE A
## TO
## ASSIGNMENT OF COPYRIGHT SECURITY INTEREST

U.S. Copyrights:

| Title | Registration No. | Date of Issue | Registered Owner |
|---|---|---|---|
| THE DRIFTER – CHARACTERS | VA 1-045-264 | June 23, 2000 | Stan Lee Media, Inc. |
| THE DRIFTER – PROPS BACKGROUND | VA 1-045-263 | June 29, 2000 | Stan Lee Media, Inc. |
| THE ACCUSER – CHARACTERS | VA 1-045-261 | June 23, 2000 | Stan Lee Media, Inc. |
| THE ACCUSER – PROPS | VA 1-045-262 | June 23, 2000 | Stan Lee Media, Inc. |
| THE ACCUSER – CHARACTERS GROUP 2 | VA 1-068-231 | September 28, 2000 | Stan Lee Media, Inc. |
| THE ACCUSER – PROPS BACKGROUND GROUP 2 | VA 1-068-230 | September 28, 2000 | Stan Lee Media, Inc. |

# Exhibit  8

 **Search Records Results**

Documents Database (PTY2/ Search)
**Search For:** QED PRODUCTIONS, LLC
**Item 1 of 1**

| | |
|---|---|
| Item 1 OF 1 | V3541 P448 (COHD) |
| Date Recorded: | 07Aug06 |
| Date Executed: | as of 31Jul06 |
| Party 1: | Stan Lee Media, Inc. |
| Party 2: | QED Productions, LLC. |
| Note: | The drifter--characters & 5 other titles. Assignment of copyright. |
| Document Location: | (V3541 D448 P1-3) |

Home   |   Contact Us   |   Legal Notices   |   Freedom of Information Act (FOIA)   |   Library of Congress

U.S. Copyright Office
101 Independence Ave. S.E.
Washington, D.C. 20559-6000
(202) 707-3000